## Case No. 9,941.

### MURDOCK et al. v. HUNTER.

[1 Brock. 135.]

Circuit Court, D. Virginia. May Term, 1808.

EVIDENCE — PROOF OF HANDWRITING — COURTS — ENGLISH ADJUDICATIONS MADE PRIOR TO THE REVOLUTION — ADMINISTRATOR — RIGHTS OF CREDITOR.

1. The subscribing witness to a bond being dead, proof of the handwriting of the attesting witness, if unaided and unopposed by other evidence, is sufficient to establish the execution of the bond.

2. The decisions of the courts of England, made prior to the Revolution, are of binding authority on the courts of Virginia. Those made since have not that character, but when they are reasonable, conformable to general principles, and do not change a rule previously established, they will not be entirely disregarded.

[Cited in Brewer v. Harris, 5 Grat. 293; Moon v. Stone's Ex'r, 19 Grat. 263.]

3. A bond creditor is not bound to pursue the personal assets of his debtor in the hands of others than his personal representative, if such pursuit threatens to be tedious, intricate, and unproductive. But if the personal estate is in the hands of legatees, who may be easily brought before the court, they ought to be made parties to the suit. See Corbet v. Johnson [Case No. 3,218].

[Cited in McLaughlin v. Bank of Potomac, 7 How. (48 U. S.) 229.]

This was a bill in chancery, filed in August, 1805, by the plaintiffs [J. Murdock & Co.], partners in trade, and subjects of the king of Great Britain, to subject certain lands in the county of Princess Anne, in Virginia, of which William Hunter died seized, in the hands of devisees, to the payment of a bond, purporting to be executed by one Thomas Claiborne, and the said Hunter. The bond was in the penalty of £316 9s., to be discharged by the payment of £158 4s. 6d., and bears date the 23d of September, 1774, payable on the 23d September, 1775, to Archibald Govan, and was attested by Andrew Ronald. At the period of the institution of this suit, both the obligors and the attesting witness were dead, and the plaintiffs adduced proof of the handwriting of Ronald, which was the only evidence offered of the execution of the bond. William Hunter died in 1777, having first made his will, appointing executors, who refused, or failed to qualify, and Elizabeth Tenant took out letters of administration, with the will annexed, of William Hunter; and after her death, Thomas Wishart qualified, as administrator of the estate of Hunter unadministered by Elizabeth Tenant. Wishart died, and Hancock qualified, but before this suit was brought. Hancock was also dead, and no subsequent administration was granted: so that at this period, there was no personal representative of Hunter.

William Hunter devised a tract of land in fee to James Tenant, lying in Princess Anne county, and containing by estimation, 517 acres, who died seized thereof. James Tenant devised the said land to Elizabeth Tenant, his mother, for life, remainder to his eldest sister, living at her death. At the death of Elizabeth Tenant, Elizabeth White, the wife of William White, became entitled to the Princess Anne estate, under the will of James Tenant, and when this bill was filed, the said Elizabeth and William White, the only defendants in this cause, were seized and possessed thereof. The plaintiffs in their bill, allege that the personal estate of William Hunter, deceased, was either exhausted, or could not be reached by the death of his administrators and their sureties, and the insolvency of some of them, and pray a decree for the sale of the said land, to satisfy their debt.

In their answer, filed in 1807, William and Elizabeth White say, that William Hunter died, possessed of a large personal estate, more than sufficient for the payment of all his debts, and refer to an inventory and appraisement of his estate, (which is made a part of their answer,) taken on the 15th day of September, 1777, by which the personal estate of William Hunter is estimated to have been worth £2468 3s.: that many of the negroes of the estate were carried away by the British troops, during the Revolutionary War, and have never since been heard of, and that the residue of the personal estate has been long since distributed among the legatees of William Hunter. They deny the sufficiency of the proof adduced, to establish the execution of the bond by Wiliam Hunter. But if the court should be of a different opinion, they insist, that after the lapse of thirty years, the plaintiffs have no right to subject the real estate of which Hunter died seized, to the payment of this bond, since, at the time it became payable (September, 1775,) there was no legal impediment to the prosecution of this claim, Great Britain and her colo-

nies in America being then politically united, and ever since the termination of the Revolutionary War, the courts of Virginia have been open to the prosecution of suits by British subjects, against citizens of Virginia: that there is now no legal representative of William Hunter, nor can any of his papers or books be found, from which a correct statement of his affairs can be made out; whereas, had the present demand been exhibited in due time, the responsibility now sought to be fixed on these defendants, would have attached to others. They admit, that the real estate which the plaintiffs now seek to subject to the satisfaction of this claim, was derived from William Hunter.[1]

MARSHALL, Circuit Justice. In this case, two points are made at the bar: 1st. That the bond on which the suit is instituted, is not sufficiently proved. 2d. That the proper parties are not made.

1st. The bond purports to have been executed by Thomas Claiborne and William Hunter, is attested by Andrew Ronald, who is since dead, and the only proof offered, is that of the hand-writing of the subscribing witness. The question, whether this testimony is sufficient to establish the execution of the bond, without any proof of the hand-writing of the obligor, has been argued on principle and on authority, and is of considerable importance in those old cases, which are frequently brought before this court. The general principle is, that the best evidence of which the nature of the case will admit, ought to be adduced. The subscribing witness himself being dead, the best proof that he attested the bond is, that the signature, purporting to be his, is in his hand-writing. This testimony, therefore, proves, that he subscribed his name to the obligation; but whether its execution shall be inferred from this fact, or must be proved by other testimony, so that proof of the death and hand-writing of the subscribing witness, simply dispenses with the necessity of producing that witness, is a question, which, on principle alone, might be decided the one way or the other, and the decision would be supported by almost equal strength of reasoning. Positive proof of the execution of a bond is required, where that proof is attainable. Where it is unattainable, the law must be satisfied with circumstantial evidence. If the plaintiff, by proving the death and hand-writing of the subscribing witness, was only let in to prove the execution of the bond by other testimony, it would seem to be sufficient to prove the death of the subscribing witness, and to identify his person by any other proof than that of his hand-writing, as, for instance, that he was the only person of that name, in a situation to render it probable that he could have attested the bond. Since it is not only necessary to prove the death, but to prove the hand-writing, of the subscribing witness, it would seem that something further than the mere permission to establish the execution of the bond by other testimony, was gained by this proof. This can only be the inference which is drawn by

---

[1] No lapse of time bars actions upon instruments, under seal, for the payment of money; but the lapse of twenty years creates a presumption of payment, which may be repelled like any other presumption. Jackson v. Pierce, 10 Johns. 414; Bailey v. Jackson, 16 Johns. 210. An acknowledgment of the debt within twenty years, or a demand of payment, or circumstances explaining satisfactorily why the demand was not made sooner, will repel the presumption; so, where for the portion of the time, the plaintiff was disabled to sue, that portion will be deducted. Id. This doctrine of presumption of payment, arising from the lapse of twenty years, is a very familiar one in our courts. Mr. Robinson has examined the Virginia cases on this subject, in his valuable work. 1 Rob. Prac. 113, 114, q. v. If a shorter period is relied on, the presumption must be corroborated by circumstances. Gordon v. Kerr [Case No. 5,611]. In Dunlap v. Ball, 2 Cranch [6 U. S.] 180; 1 Conn. 383, which, as regards the question of presumption of payment, is identical with the above case of Murdock v. Hunter, the suit was brought in 1802, upon a bond executed in 1773, by the defendant, a citizen of Virginia, to the plaintiffs, British merchants, residing in Great Britain. The case went to the supreme court, on a bill of exceptions to the opinion of the court below, instructing the jury, that from the length of time, stated in the facts agreed on, the bond in law, was presumed satisfied; unless they should find from the evidence, that interest was paid on the bond, within twenty years from the 5th of September, 1775, (the time of the last payment;) or that a suit or demand was made, on the said bond, within twenty years from the last mentioned time, exclusive (in both cases,) of five years, five months, and twenty days, taken out of the act of limitations. The supreme court said (Marshall, C. J., delivering the opinion of the court,) that the only circumstance which could create a question in the case was, that twenty years had not elapsed, exclusive of the period, during which the plaintiffs were under a legal disability to recover before the action was brought: that the doctrine of the presumption of payment arising from lapse of time, was a reasonable one, and might be rebutted by any facts that would destroy the reason of the rule. That no presumption could arise, during a state of war, in which the plaintiff was an alien enemy, was too clear to admit of doubt. But it was not so clear, that upon a bond so old as this, the same length of time, after the removal of the disability, was necessary to raise the presumption of payment, as would be required if the bond had borne date at the time of such removal. It being satisfactorily shown to the court, that it was the general understanding in Virginia that British debts could not be recovered there, earlier than 1793, when the first decision of the superior courts, establishing the right of recovery was rendered; the only question was, whether, in case of an old debt, the same time was required to raise the presumption, as in the case of a debt accruing since the impediments had been removed? In such a case, it was not easy to establish a new rule, and the court thought it best to adhere to the old decisions, that twenty years must have elapsed, exclusive of the period of the plaintiff's disability, and were of opinion, that the court below erred, in directing the jury, that payment ought to be presumed. The cause was remanded to the circuit court, to be there tried, with directions, that there was no presumption of the payment of the said bond, as directed by the said circuit court.

the law, that if the person who attested the bond was present, he could and would prove its execution. This, however, is only circumstantial proof, and may certainly be strengthened by other circumstances, as by proof of the hand-writing, or the acknowledgment of the obligor. I was, myself, at first, inclined to think that, on principle, this additional proof was indispensably necessary, but an observation made by the plaintiff's counsel in argument has considerable influence. It is, that if the obligor acknowledges, and thereby adopts the signature as his, in the presence of the subscribing witness, he is as much bound as if his name had been written by himself. It would seem, then, that the positive necessity of proving the hand-writing of the subscribing witness, although he be dead, would justify the opinion, that the law infers from this proof, that the subscribing witness would, if present, prove the execution of the bond, and that a naked case, standing singly on this proof, would be in favour of the plaintiff. But this evidence, which is merely circumstantial, may be met by other circumstantial evidence. Whatever deducts from it, may, and ought to be, weighed against it. It is, therefore, always advisable to support it by other testimony, if such other testimony be in the power of the plaintiff.

On passing from principle to authority, it may not be improper to premise, that as the common law of England was, and is, the common law of this country, and as an appeal from the courts of Virginia lay to a tribunal in England, which would be governed by the decisions of the courts, the decisions of those courts, made before the Revolution, have all that claim to authority, which is allowed to appellate courts. Those made since the Revolution, lose that title to authority, which was conferred by the appellate character of the tribunal which made them, and can only be considered as the opinions of men distinguished for their talents and learning, expounding a rule, by which this country, as well as theirs, professes to be governed. An opinion, avowedly changing a rule, would certainly deserve much less consideration, than one declaring the rule on a point which appears not to have been well settled.

The first decision of this question, which has been cited at the bar, is that reported by Viner, which appears to have been made at nisi prius, and is in favour of the opinion, that the proof of the hand-writing of the subscribing witness, who is dead, is sufficient, if unopposed, to establish the execution of the bond.[2] Previous to this, however, the point would seem to have been noticed by Lord Holt, at nisi prius, in a case reported in 1 Ld.

Raym. 734. "A deed was produced, to which there were two witnesses, one of whom was blind. It was ruled by Holt, that such deed might be proved by the other witness and read, or might be proved, without proving that the blind witness is dead, or without having him at the trial, proving only his hand. And so it was done in this case." Wood v. Drury, 1 Ld. Raym. 734.

This report is too indistinct, and too short, to be satisfactory. It would rather seem, however, that the deed was proved, by proving the hand-writing of the blind witness. Perhaps, in addition to this, the execution of the deed was proved by the other witness, and that which would indicate the contrary, may be ascribed to the inaccuracy of the reporter. I am inclined to think it is. In the cases cited from Strange, Peere Williams, Atkyns and Douglass, supplemental proof was offered and received, but the question, whether without that supplemental proof the execution of the bond would be established, by proving the death and hand-writing of the subscribing witness, was not made to the court, nor decided. It would seem that considerable weight was given to this additional testimony. In 1790, in the case. Wallis v. Delancey,[3] at nisi prius, Lord Kenyon decided this question directly, and decided it against the sufficiency of the proof of the hand-writing of the subscribing witness, if unaided by other testimony. The case of Barnes v. Trompowsky, 7 Durn. & E. [7 Term. R.] 265, which was decided in 1797, while Lord Kenyon was on the bench, turned upon the necessity of proving the hand-writing of the subscribing witness, not on the sufficiency of that proof; for in that case, the hand-writing of the obligor was proved. The case of Adam v. Kerr, 1 Bos. & P. 360, was decided in 1798, and dispenses with other proof than that of the hand-writing of the subscribing witness. Such proof was declared to be evidence of every thing on the face of the paper. In this case, the rule for a new trial was refused by the court of common pleas, so that the point was not permitted even to be argued. The case of Prince v. Blackburn, reported in 2 East, 250, and decided in 1802, was upon the question of the admissibility; not of the sufficiency of the proof. But Judge Le Blanc, before whom the cause was tried at nisi prius, reported the testimony, and takes no notice of any supplemental evidence. If none was given, this case confirms that of Adam v. Kerr. Whether it was given or not, does not certainly appear. In his Law of Evidence, Mr. Peake supposes the law to be now settled in England, in conformity with the decision of Adam v. Kerr. He states the determination

<hr>

[2] "Where there are two witnesses to a deed who are dead, if there be full evidence to prove one of their hands, and any evidence that endeavours have been used to find one to prove the other's hand, it is sufficient; for perhaps the witness might be a stranger, and it would be a hard task to prove his hand; per cur. Comb. 248; Pasch. Term 6 W. & M. in B. R., in case of Smart v. Williams," 12 Vin. Abr. 223, § 3, tit. "Evidence."

[3] Reported in a note to Barnes v. Trompowsky, 7 Durn. & E. [7 Term R.] 266.

to have been made in a case where the subscribing witness was dead; but does not say the law would be otherwise in any other case, where the disability of the subscribing witness was permanent, nor is there any reason for distinguishing such a case from one where he was actually dead.

From this review, the law appears to be now settled in England, that if the subscribing witness be dead, proof of his hand-writing is sufficient to establish the execution of the paper he has attested; but it has been decided by cases since the Revolution, which are not authority in the United States. When, however, they are reasonable, are conformable to general principles, and do not change a rule previously established, such decisions cannot be entirely disregarded. The decisions upon this point appear to be of this character, and the court is inclined to the opinion, that in a case unsupported and unopposed by any other circumstance whatever, this proof would be deemed sufficient to establish the execution of the bond.[4]

In the case formerly decided in this court, there were circumstances which rendered the proof of the hand-writing of the witness unsatisfactory. It was proved that there were two men of the same name, and it could not appear from the hand-writing of the witness, by which of them the bond was executed. That there are in this case two obligors, does not seem sufficient to take it out of

the rule. It is, however, possible, that a signature may have been added after the attestation, and consequently, circumstances less decisive may outweigh the inference drawn from the hand-writing of the subscribing witness, than would be required in the case of a single obligor. The face of the paper is not absolutely free from suspicion. The signature of Hunter bears such a resemblance to the character of the writing in which the bond is filled up, and with which the name of Claiborne is signed, as to excite some suspicion. If this circumstance stands alone, it cannot be much regarded, but if it should be aided by others, it may deserve consideration. In a case where the parties originally managing the cause are dead, and the person now looked to for testimony has been induced by his counsel to suppose that his testimony would not be required at this term, such light suspicion may induce a suspension of the decision until another term.

The second point is, that proper parties are not made in this cause. In the case of Corbet v. Johnson [Case No. 3,218], it was decided in this court, that a bond creditor was not bound to pursue the personal assets into the hands of others than the representative of the debtor, if such pursuit threatened to be tedious, intricate, and unproductive. This case is supposed to have established the principle, that in no case whatever, is the bond creditor bound to go beyond the legal per-

---

[4] The cases cited by the chief justice, with some more modern English decisions, have all been reviewed by Mr. Starkie, in his treatise on the Law of Evidence. 1 Starkie, Ev. (Metcalf's Ed.) 337–343, inclusive. He lays down the general rule, as deduced from that review, to be, that where there have been sufficient attesting witnesses, whose absence is satisfactorily accounted for (as that they are dead, out of the country, infamous, have become interested, &c.) the proper proof is by giving evidence of the hand-writing of the attesting witnesses; and it is usual, he says, in such cases, to give evidence also of the hand-writing of the obligor. And where there are two attesting witnesses, one of whom is dead, and the other out of the country (as in the case of Adam v. Kerr, supra), proof of the hand-writing of the deceased witness is sufficient evidence of the execution of the paper, without proof of the hand-writing of the absent witness, or of the obligor; so, where one of the attesting witnesses, after diligent inquiry made, could not be found, and the other had become interested since the attestation, it was held that evidence of the hand-writing of the latter witness was sufficient proof (Cunliffe v. Sefton, 2 East, 183); and where one was dead and the other denied his signature, Lord Holt admitted evidence of the hand-writing of the former (Blurton v. Toon, Skin. 639). For a reference to the leading American decisions, as to the proof of hand-writing of the subscribing witness, where he is dead, &c. and its sufficiency, see Mr. Metcalf's note 1, 1 Starkie, Ev. 342. See, also, opinion of Carr, J., in Gilliam's Adm'r v. Perkinson's Adm'r. 4 Rand. [Va.] 327, and of Green, J., in Gregory v. Baugh, Id. 636, and the authorities there cited. It is said in Spring v. South Carolina Ins. Co., 8 Wheat. [21 U. S.] 268, 5 Pet. Cond. R. 434, to be the practice of that court, to require proof of the hand-writing of both the dead or absent witness, and of the obligor. That this has not been, however, the invariable practice of that court, at least in

the case of old bonds, is obvious, from the case of Coulson v. Walton, 9 Pet. [34 U. S.] 62. In that case the genuineness of a bond thirty-five years old at the filing of the bill was drawn in question. The obligor and obligee, and one of the attesting witnesses were certainly dead, and the other attesting witness was supposed to have been killed by the Indians many years before. Three witnesses deposed to the hand-writing of the first mentioned witness, but no proof was offered of the hand-writing of the obligor, or of the other witness. The court cited the doctrine laid down in Barr v. Gratz, 4 Wheat. [17 U. S.] 231, "that where a deed is more than thirty years old, and is proved to have been in possession of the lessors of the plaintiff in ejectment, and actually asserted by them, as the ground of their title in a chancery suit, it is, in the language of the books, sufficiently accounted for, and it is admissible in evidence, without regular proof of its execution by the subscribing witnesses;" and held the bond sufficiently proved, by the proof of the hand-writing of the deceased attesting witness. See, also, Winn v. Patterson, 9 Pet. [34 U. S.] 663; where, under the circumstances of the case, even a copy of a recorded power of attorney, forty years old when it was offered as evidence, (the loss of the original having been accounted for), was admitted on proof of the hand-writing of one of the attesting witnesses, the other being presumed to be dead after thirty years. The proof of the hand-writing was the deposition of the deputy clerk of the court where the power was recorded. The deponent stated that he was familiar with the hand-writing of the witness (who was a justice of the peace, and who signed it as such); that he was dead; that he must have believed the official signature of the witness to have been genuine at the time, or he would not have admitted the paper to record, and that the paper offered was a true copy from the record, he having compared it with the record of the original made by himself.

sonal representative of the debtor. In support of this construction of that opinion, the plaintiff relies on these expressions. "With respect to the creditor, unless it be for his advantage, the personal estate may be said to be exhausted, when there are no longer assets in the hands of the executor." These words are used with reference to general dicta, found in cases cited by the heir, which declare, that the personal estate must be first exhausted, before the creditor would receive the aid of a court of equity against the real assets, and are intended to show the sense in which those dicta ought to be understood. They do not lay down a substantive, independent principle. If, in the case of Corbet v. Johnson [supra], the personal estate, instead of being wasted, had been in the hands of legatees, who could with ease have been brought before the court, I should have directed them to be made parties to the suit, and if such was the fact in this case, the opinion delivered on that occasion, would not be considered as opposed to a similar direction. But such does not appear to be the fact. The answer of the heir does not allege personal property in the hands of the legatees. On the contrary, it seems to rely on the waste of that property, as an objection to the recovery of the plaintiff; because, the resort of the heir against the personal fund is lost. The fact of an existing personal fund is not proved, and if it was proved, we are not sure that the court could notice it, in contradiction to the allegations of the parties. The case then, appears to stand on the same principles in this particular, with that of Corbet v. Johnson, and the court adheres to the opinion given in that case. But no decree will be given at this term, because the court is not satisfied under the particular circumstances of the parties, to declare, that this is the deed of William Hunter, although, perhaps, the difficulty will not be deemed sufficient at the next term, to prevent a termination of the suit.

There is at present certainly one conclusive impediment to a decree, which has not been mentioned, because it is presumed, that the plaintiff is able to remove it, and because, should it be removed, the court would still suspend its decision on the obligation, for further proof from the defendants. That impediment is the want of title in the plaintiff. There is no evidence, that the bond was taken for his benefit.[5] An issue may be directed, if the plaintiff has no objection. If he has, it will probably be directed at the next term, provided the defendant then exhibits circumstantial testimony against its being the deed of William Hunter.

---

MURDOCK (WHETMORE v.). See Case No. 17,510.

---

[5] The bond purports to have been executed by Thomas Claiborne and William Hunter, in favour of Archibald Govan, and there is no assignment endorsed upon it to the plaintiffs, or to any other parties whatsoever.

## Case No. 9,942.

### MURDOCK et al. v. WOODSON et al.

[2 Dill. 188.] [1]

Circuit Court, W. D. Missouri. June 16, 1873.[2]

RAILWAY MORTGAGE—POWER OF TRUSTEES TO SUE —JURISDICTION OF FEDERAL COURT OVER STATE OFFICERS — CONSTITUTIONAL LAW — SPECIAL ACTS—TITLE OF ACT—CONSTRUCTION OF THE CONSTITUTION OF MISSOURI AS TO RELEASE OF THE STATE'S LIEN ON RAILROADS.

1. The trustees in a railway mortgage for the benefit of numerous and widely scattered bondholders secured thereby, have sufficient authority and interest to enable them to bring a bill in equity to enjoin an alleged illegal proceeding which will injure the value of the bonds and cast a cloud upon the security, or a bill to have a controverted priority of lien settled before an irredeemable sale is made under another mortgage, which is claimed to be prior to that made to the trustees.
[Cited in Mercantile Trust Co. v. Texas & P. Ry. Co., 51 Fed. 537.]

2. The circuit court of the United States may, in a proper case, enjoin the agents or officers of a state, whatever may be their grade, and this although the state may be the real party in interest; this doctrine applied in this case against the governor of Missouri acting as the special agent of the state in the foreclosure of a mortgage lien for the benefit of the state.
[See Bancroft v. Thayer, Case No. 835.]

3. In 1868, the state of Missouri, holding a first mortgage lien upon the Pacific Railroad of that state as indemnity for state bonds issued for the benefit of that company, passed an act by which, in consideration of $5,000,000, to be paid by the company to the state, and which was paid, the state released and discharged the company from the lien and all liability in respect of said bonds; and on the faith thereof the company mortgaged its roads to raise money to pay the state, undertaking to give the lenders a first lien. In 1873, the legislature of the state directed the foreclosure of the state's mortgage which had been released: *Held* (construing various provisions of the constitution of the state), that, under section 27, art. 4, of the constitution of the state, the act of 1868 was not invalid because it was a special law.
[Cited in Trask v. Maguire, Case No. 14,145.]

4. Under section 32, art. 4, of the state constitution, it was not invalid because it related to more than one subject; and it was also held that the subject was sufficiently indicated by the title of the act.

5. The state legislature was not prohibited by section 15, art. 11, of the state constitution, or by the railroad constitutional ordinance of the state from discharging its mortgage or lien on receiving the full value of its security, and of that value the legislature was the judge; so held in favor of bondholders who in good faith advanced to the company the money with which to make payment to the state.
[Cited in Ketchum v. Pacific R. Co., Case No. 7,740.]
[Cited in brief in State v. Chappell, 74 Mo. 337.]

6. It seems that the statutory lien reserved by the state was for its indemnity, and was under its control as between it and the holders of its bonds.

The case came before the circuit judge at his chambers on an application by the plain-

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

[2] [Affirmed in 22 Wall. (89 U. S.) 351.]

# MURDOCK (Case No. 9,942)

tiffs [Uriel A. Murdock and Luther Clark], trustees in a mortgage made by the Pacific Railroad of Missouri, dated July 15, 1868, for a preliminary injunction to restrain the defendants—[Silas] Woodson, who is the governor, and [H. Clay] Ewing, who is the attorney general, of the state of Missouri—from advertising and selling the said Pacific Railroad and its franchises under a statutory lien thereon claimed by the state of Missouri. The bill is very voluminous, but the following abstract will suffice to show its general nature and scope. It sets forth that the plaintiffs are citizens of New York, and that Woodson and Ewing, named above, are governor and attorney general of the state of Missouri, and that the Pacific Railroad is a corporation created by and under an act to incorporate the Pacific Railroad, approved March 12, 1849, to construct and operate a railroad from St. Louis to a point near Kansas City, and that it did in 1851 commence the construction of the said road, and that now said road is two hundred and eighty-three miles in length; that during the progress of the work of construction the state loaned its credit to the company by issuing its bonds to the aggregate amount of $7,000,000; that of the bonds so delivered to the company the sum of $2,000,000 was under the act of February, 1851, entitled "An act to expedite the construction of the Pacific Railroad, and of the Hannibal & St. Jo. Railroad." The bill then recites the terms and conditions upon which the bonds were to be paid, and also the conditions upon which bonds were granted to the railroad in 1855, and also that by authority of acts of the legislature subsequent to the act of 1851, bonds to the amount of $5,000,000 were issued by the governor and delivered to the railroad company, and negotiated, the proceeds being used in the construction of the road—said bonds constituting a mortgage or first lien on the road and its appurtenances. It is stated that the entire amount of bonds thus issued was $7,000,000, the first $3,000,000 being redeemable at the pleasure of the legislature at any time after the expiration of twenty years from date of issue, and the remainder payable in thirty years from date of issue. The bill then sets forth the disastrous effect of the war of the Rebellion on the road, then completed from St. Louis to Sedalia, one hundred and eighty miles; that no work of construction was done between the years 1861 and 1864, nor was work resumed until after the legislature had empowered the company to borrow money to complete its line authorizing it to issue 1,500 bonds of $1,000 each, bearing interest at the rate of seven per cent, payable in four, five, and six years after date, to secure the payment of which the company was authorized to place a mortgage constituting a first lien on the line of its road west of Dresden for a distance of sixty-five miles, it being required that the proceeds of said bonds should be applied to the completion of that part of the road. By the same act, the state of Missouri relinquished its first lien and mortgage, and right of forfeiture on all that part of the road west of Dresden, retaining, however, a second lien or mortgage thereon, with condition that on the payment of the $1,500,000 the state's second lien should become a first lien. By the provisions of the act it was made obligatory on the company to apply all its net profits to the extension and equipment of such part of its road until fully completed, reserving sufficient only for the payment of interest on the bonds actually issued by the company known as the Dresden bonds. The company obtained the money on these bonds, and was extending the line in 1864, when "a large army of insurgents" entered the state and marched along the line from Franklin, thirty-five miles from St. Louis, to the western terminus of the line at Warrensburg, a distance of one hundred and eighty-three miles, and destroyed bridges, cars, engines, and other property to an amount exceeding $1,000,000, rendering the road unfit for use for many months thereafter, and hence the road was not completed to the state line within the time, or at such reasonable cost as was contemplated by the Dresden bonds. In consequence of these serious losses, and the inability of the state to extend any more aid, the people of the city and county of St. Louis, by authority of law, loaned their credit, in 1865, to said company in the sum of $700,000, for which bonds of the county for that amount were issued, payable in twenty years from date, and delivered to the company on its obligation to pay the interest as it matured, and redeem the bonds themselves when due.

The road was finally put in running order to the western boundary of the state, in 1866, but the Dresden bonds and the county credit proved insufficient to pay for such extension and for the repairs and equipment, and at the time of the completion there remained due, chiefly to citizens of Missouri, a large floating debt, which in equity and good conscience, together with the loan by St. Louis county, possessed claims for payment not inferior to those possessed by the state under its statutory mortgage. In 1868, the said floating debt amounted to $1,092,848, besides an unaudited debt of $290,000, and the first installment of the Dresden bonds, $500,000, was not paid. At this time a large portion of the stock, $3,614,500, was held by citizens of Missouri, and by counties and cities therein—$2,280,000 being held by St. Louis city and county. So the company appealed to the general assembly and people of the state for protection—since if the governor sold the road, according to the terms of the bond acts, all of the stock would be foreclosed, and the purchaser would hold the road and appurtenances uncontrolled by the said stock, or any part of

it, and a loss of over $3,500,000 would be inflicted on the state—and great losses on other people. The state came to the rescue, and proceeded to legislate on the subject of a settlement and payment by the company of all claims due the state, the foreclosure of its mortgage, and a sale and conveyance of its rights in the property. An act was passed in 1868, entitled "An act for the sale of the Pacific Railroad and to foreclose the state's lien thereon, and to amend the charter thereof," the first section of which required the governor to sell the Pacific Railroad according to the provisions of the act of 1851, it being provided that the price for which the road might be sold at public auction should not be less than $8,350,000, payable to the state treasurer in bonds of the state or in money, within ninety days from the day of sale, and if such sum should not be realized, the governor should buy the road for and in the name of the state. And it was provided that if any other person than the state should purchase the road, then the state should assume and pay the principal and interest due, or to become due, on the $700,000 bonds issued by the county of St. Louis, and also $650,000 of the floating debt of the company. The purchaser must also bind himself to change the gauge of the road its entire length within ten years from the date of sale, so as to conform to the gauge of the Union Pacific Railroad Company; it was further provided, that if the company should, within ninety days from April 1, 1868, pay into the state treasury the sum of $350,000 in bonds of the state or in money, then the governor should not advertise the road for sale—and on the payment of $5,000,000, in cash or state bonds, within ninety days thereafter, then the governor was to deliver to the road a release of all state claims. These amounts were paid at the time specified, and Governor Fletcher delivered the release as provided by law. The orators then declare that the price paid by the company in liquidation of the debt was largely in excess of the true value of the property mortgaged, and as a means of paying the Dresden bonds, of purchasing iron and rolling stock, and paying off the floating debt, and especially to raise the funds to pay the balance of the sum due the state, $4,650,000, the company, July 15, 1868, mortgaged to complainants and one James Punnett (now deceased), the entire line of the Pacific road from Fourteenth street in St. Louis, to Kansas City, to hold in trust for the use and benefit of the holders of the bonds to be issued according to conditions of the said mortgage, on condition that if the company should pay said bonds and interest, the mortgage should be void, but on failure to do these things, they should be authorized; on the written request of any one bondholder, to cause the property to be advertised and sold in St. Louis, for cash, on ninety days' notice. Said trustees ac-

cepted the trust, but since that time Mr. Punnett died, and his vacancy has not been filled. These purchasers, it is averred, would not have purchased said bonds had they entertained any doubt as to the constitutionality of the law authorizing them so to do—and the general assembly has held five sessions since that conveyance, and has raised no objections to the act aforesaid; and during that time the railroad bonds were being sold and transferred from hand to hand until half of them were gone; so the investment made by the complainants was made in full confidence as to the good faith of the state. The mortgage was executed to complainants in July, 1868, and since then the railroad company has issued other bonds amounting to $3,000,000, at seven per cent, the proceeds being used to make valuable improvements, besides which the company have purchased valuable real estate in the city of St. Louis, and made several other large expenditures in good faith.

The bill charges Governor Woodson and Attorney General Ewing, with combining and confederating with parties unknown to your orators, "how to injure and wrong your orators and the bondholders, whom they represent under the deed aforesaid, have threatened and do now threaten to cause the whole of said railroad to be advertised for sale, to satisfy supposed claims due the state under the acts granting aid as aforesaid; and that the governor's acts have already caused great decline in all the bonds and other securities issued by said company, and have aroused the most serious apprehensions and alarm among the holders thereof—all this on the ground that the lien on the state on said road exists in full force, notwithstanding the provisions of the act of the 31st of March, 1868; also pretending that the authority to advertise the road for sale as conferred by the act of 1851, is still in force, and that the act of 1868 only repeats its authority so to do. The orators declare that these pretensions are unfounded, as also is the claim that the company is indebted to the state for interest paid on the bonds of the state issued as aforesaid to the company. The governor also pretends he is authorized to sell the road by the provisions of a resolution passed by the general assembly, March 21, 1873, by which the attorney general is authorized to institute proceedings for the purpose of testing the constitutionality of the law of March 31, 1868, before the supreme court of the state. And so the orators pray the court to grant them a writ of injunction restraining defendants from advertising or selling the road, or any part thereof, and to grant such other relief as the necessities of the case require. To this bill the governor and attorney general filed an answer, in substance, alleging that ten millions and a half of state bonds of Missouri were loaned to the Pacific Railroad Company, under the acts of 1851–53–55–57, some of them having twenty years to run, and others thirty

years, with coupons attached for the payment of semi-annual interest, at six per cent per annum. That the company had never paid either principal or interest on said bonds; that the company had sold said bonds to bona fide holders, for value, in 1852-53-54-55-56-57-58, all of said bonds being secured by a first lien on said railroad and its appurtenances, the company being bound to pay all the coupons and the bonds when they respectively become due. That the state was not liable for any damage or loss of the company by reason of the war of the Rebellion. That the fifth section of the act of the 31st of March, 1868, is unconstitutional and void, being in direct conflict with the fourth section of an ordinance for the payment of state and railroad indebtedness, adopted by the convention on the 8th of April, and by the people of the state on the 6th of June, 1865, and also in conflict with the constitution adopted at the same time. That the bona fide holders of said state bonds could not be prejudiced by the said act of 1868, or any other act of legislation affecting the validity of a contract created by the said acts, loaning the said ten and a half millions of state bonds to the railroad company, secured by a statutory mortgage, which was the first lien upon the said Pacific Railroad and its appurtenances. That said bondholders were entitled to said first lien, and to insist that the road should be sold by the governor of Missouri to provide means for the payment of said bonds. That the five million dollars paid by the company to the state, under the act of 1868, should be applied to the liquidation of the interest then due the state on the coupons that had been paid by the state. That the interest due the state was then largely in excess of the sum of said five million dollars, and that the governor was bound to sell the said road and its appurtenances under the statutes of Missouri.

James Baker and John B. Henderson, for plaintiff.

H. Clay Ewing. Atty. Gen. of Missouri, and Hill & Bowman, for defendant.

DILLON, Circuit Judge. In 1851, and at various times between that year and 1855, the general assembly of the state of Missouri passed acts loaning the credit of the state to the Pacific Railroad, to the Southwest Branch thereof, to the Hannibal & St. Joseph Railroad, to the Iron Mountain Railroad, and other railroad companies. The present case relates alone to the (Missouri) Pacific Railroad, whose line extends from St. Louis to Kansas City. The object of the legislation was to secure the completion of the roads. The form in which the aid was extended was this: The state made its bonds, promising to pay the amounts thereof to the company or its order, with coupons attached; and by the act "the faith and credit of the state were pledged for the payment of the interest and the redemption of the principal of the said bonds." Act of February 22, 1851 (Laws 1851, p. 265).

The company was, by the act, to make provision for the punctual payment of the interest and principal of the bonds so issued by the state, so as to exonerate the state from advances of money for that purpose. To secure this undertaking on the part of the company, the act provided that the net tolls and income of the road should be pledged for the payment of interest, and that the acceptance of the bonds by the company "should become and be, to all intents and purposes, a mortgage of the road of the company, and every part and section thereof, and its appurtenances, to the people of the state, for securing the payment of the principal and interest of the sums of money for which such bonds shall, from time to time, be issued and accepted as aforesaid."

This was to be the first lien, or mortgage on the road, and it was further provided by the act that if the company should make default in the payment of either principal or interest, no more bonds should be issued to it, and it should be lawful for the governor to sell the road and its appurtenances, at auction, to the highest bidder, on six months' notice; or to buy in the same, at such sale, for the state, subject to such disposition of the road or its proceeds as the legislature might thereafter direct. Act of February 22, 1851.

Under these provisions as to security, it is admitted in the bill, that state bonds were, from time to time, issued for the benefit of the Pacific Railroad, to the extent of $7,000,000. The answer asserts that the amount thus issued was over $10,000,000. The acts of the legislature referred to would seem to show that about $10,000,000 of bonds were issued to the Pacific Railroad, but part of this amount was for the Southwest Branch (now the Atlantic & Pacific Railroad), and secured on that road alone, leaving $7,000,000 to the Pacific road proper. It is not regarded as necessary on this application to determine whether the averment of the bill or of the answer as to the exact amount of bonds issued to the Pacific Railroad is correct.

In 1864, the road not being completed, the legislature of Missouri authorized the company to borrow $1,500,000, payable in four, five, and six years, and to secure it by a first lien on the road west of Dresden—the state waiving, for this purpose, and to this extent, its priority of lien.

In 1866 the road was finished and put in running order to the west line of the state, but in order to effect this the company had, in 1865, received aid from St. Louis county to the amount of $700,000. On the 31st day of March, 1868, the act was passed the validity of which so far as relates to its fifth section is the only question which this case on its merits presents. At this time the road is stated in the bill to have been in bad condition as to repairs and equipments, and the com-

pany owed a floating debt of $1,092,848, an unadjusted debt of about $200,000, and the first instalment of the Dresden bonds, amounting to $500,000. Of its stock, $3,-614,500 was held by citizens and municipalities of Missouri—over $2,000,000 by St. Louis city and county, or tax-payers therein. The company had failed, since July, 1859, to pay interest on the state bonds.

Meanwhile the new constitution of the state had been adopted, which went into effect July 4, 1865. In the body of the constitution (article 11, § 15), is this provision: "The general assembly shall have no power, for any purpose whatever, to release the lien held by the state upon the railroad." In addition to this a constitutional "ordinance for the payment of state and railroad indebtedness" had been adopted which went into effect June 6, 1865. This ordinance provided for the levy of a heavy annual tax upon the Pacific Railroad and other roads, to be "appropriated to the payment of principal and interest now due, or hereafter to become due, upon the bonds of the state, or the bonds guaranteed by the state, issued to the aforesaid railroad companies."

By the fourth section of the ordinance it is provided, that "should either of said companies refuse or neglect to pay said tax as herein required, and the interest or principal of any of said bonds, or any part thereof, remain due and unpaid, the general assembly shall provide by law for the sale of the railroad and other property, and the franchises of the company that shall be thus in default, under the lien reserved to the state, and shall appropriate the proceeds of such sale to the payment of the amount remaining due and unpaid from said company." And the fifth section of this ordinance provides that "whenever the state shall become the purchaser of any railroad, or other property, or the franchises sold as hereinbefore provided for, the general assembly shall provide by law in what manner the same shall be sold for the payment of the indebtedness of the railroad company in default, but no railroad or other property, or franchises purchased by the state, shall be restored to any such company until it shall have first paid in money, or in Missouri state bonds, or in bonds guaranteed by the state, all interest due from said company; and all interest thereafter accruing shall be paid semi-annually in advance, and no sale or other disposition of any such railroad or other property, or their franchises, shall be made without reserving a lien upon all the property and franchises thus sold or disposed of, for all sums remaining unpaid; and all payments therefor shall be made in money or in the bonds or other obligations of the state."

With these provisions of the constitution and constitutional ordinance in force, and in this condition of the company as respects its road and its indebtedness to the state and to others, the legislature passed the act of March 31, 1868. Laws 1868. p. 114. This act is entitled "An act for the sale of the Pacific Railroad, and to foreclose the state's lien thereon, and to amend the charter thereof."

"Sec. 1. The governor is hereby directed and required to sell the Pacific Railroad and its appurtenances, and all property belonging thereto, in accordance with the provisions of section 5 of this act, and an act entitled 'An act to expedite the construction of the Pacific Railroad and of the Hannibal & St. Joseph Railroad,' approved February 22, 1851.

"Sec. 2. Upon the sale of the road, as provided in the foregoing section, the price and the sum for which the same shall be sold shall not be less than eight millions and three hundred and fifty thousand dollars, payable to the state treasurer, in bonds of this state or in money, within ninety days from the date of sale. No bid, except the bid of the governor on behalf of the state, shall be accepted, unless there is paid to the state treasurer, who shall attend the sale, an amount of not less than three hundred thousand dollars in such bonds or money, as a part of the purchase money, to be paid when the road is stricken off; and such bonds or money shall be forfeited to the state in case the purchaser or purchasers shall fail to pay the amount of purchase money bid within the time above provided for. Such sale shall take place at the east front door of the court house, in the city of St. Louis, between the hours of ten o'clock in the forenoon and four o'clock in the afternoon.

"If said sum of eight millions three hundred and fifty thousand dollars is not realized at such sale, the governor shall, by himself or agent, buy in the same for and in the name of the state of Missouri."

Section 3 is not important in the questions before the court.

"Sec. 4. Upon the payment of all the purchase money as specified in section 2 of this act, and upon the delivery of an obligation in conformity with section 3 of this act, the governor shall execute a deed to the purchaser or purchasers, conveying all such right, title, and interest, in and to said Pacific Railroad, its franchises, appurtenances, and the property belonging thereto, as are subject to the lien of this state."

Then follows section 5, which is the one on which the principal question made in this case turns:—

"Sec. 5. If the Pacific Railroad shall, at any time within ninety days after the first day of April, 1868, pay into the treasury of the state the sum of three hundred and fifty thousand dollars. in the bonds of this state or in money, then, and in that event, the governor shall not advertise said road for sale; and if the said company shall, within ninety days thereafter, pay into the state treasury an additional sum equal to five millions of dollars in all (the same being either in cash or Missouri state bonds), the governor shall, upon the

production of the receipts of the state treasurer for said amounts, execute and deliver to the said Pacific railroad company a deed of release for all claims, title, and interest, which the state of Missouri has in and to the said Pacific Railroad, its property and appurtenances; and the said Pacific Railroad Company shall, from and after the delivery of said deed, be fully discharged from all claims or debts due to the state, and all liability growing out of the issue of the bonds of the state to aid in the construction of said road, and no sale shall, in that event, take place under this act. If, however, for any cause, the said company shall be unable to pay the additional sum as herein provided, the governor shall proceed to advertise said road; but if the said company shall, during the pendency of said advertisement, pay into the state treasury the additional sum, with interest thereon from the first day of October, 1868, at the rate of six per cent. per annum, then, and in that case, no sale of said road shall take place, and the governor shall execute and deliver to the said Pacific Railroad Company the deed of conveyance and release provided for in this act, and the said Pacific Railroad Company shall be exempt from all the liabilities and obligations herein specified; but in case the said company shall, after the payment of three hundred and fifty thousand dollars above stated, fail to pay the additional sum specified (being the remainder of the five millions), then, and in that case, the sum first paid shall be forfeited to the state."

It is admitted that the company within ninety days paid into the state treasury the $350,000, and within ninety days thereafter, the balance of the $5,000,000, and received a deed from the governor in pursuance of the act releasing and discharging it and its property from all liens and claims on the part of the state, and from all liability growing out of the issue of the bonds of the state to aid in the construction of its road.

In order to retire the Dresden bonds and to raise the $5,000,000 to be paid to the state and to put its road in repair, the company, on July 15, 1868, made a mortgage to the plaintiffs as trustees, to secure $7,000,000 of bonds. This mortgage recites the act of March 31, 1868, and it was the professed intention to make it after the payment of the $5,000,000 to the state, and upon payment of the Dresden bonds a first lien on the entire Pacific road, its property and franchises. Subsequently, on July 1, 1871, a second mortgage was made by the company for $3,000,-000, the proceeds of which it is alleged were exclusively used in improving the road and in purchasing rolling stock. Both of these mortgages are outstanding and unpaid, as also another mortgage for $800,000 secured upon certain lands in St. Louis purchased for depot purposes.

In March, 1873, the general assembly of Missouri adopted a concurrent resolution reciting that grave doubts had arisen as to the constitutionality of the act of March 31, 1868, and directing the attorney general of the state "to institute and prosecute all suits and other proceedings at law and in equity requisite and necessary for the purpose of testing and causing to be determined by the supreme court of the state of Missouri, the constitutionality of said act, and to institute and prosecute such suits and proceedings at law and in equity as may be requisite and necessary to protect and enforce all the rights, interests, and claims of the state against the Pacific Railroad (of Missouri)."

Under this authority, the governor, by the advice of the attorney general and his associate counsel, has resolved to proceed, not by suit, but by advertising the road and its appurtenances for sale under the original statutory lien in favor of the state. This proceeding on the part of the state authorities assumes that the fifth section of the act of March 31, 1868, is unconstitutional; that the statutory lien of the state is yet in full force, and that it is the first lien on the Pacific road, its property, and appurtenances; and if this assumption is well founded in point of law, the proposed sale, if made, would cut off the mortgage to the plaintiffs, and the rights of the holders of the seven millions of bonds secured thereby. On the other hand, if the fifth section of the act of March 31, 1868, is not unconstitutional, then the state has no lien to be enforced, and the proposed sale, if made, would be wholly nugatory.

On the merits, the controlling question in the case, therefore, is, whether the fifth section of the act of 1868 violates some provision of the constitution or constitutional ordinance of the state.

Before reaching this question, some objections of a preliminary nature to the case made by the bill must be determined.

1. It is insisted by the attorney general of the state and his associate counsel that the plaintiffs have no sufficient authority, interest, or title, to enable them to maintain this suit or ask the relief sought. The plaintiffs are the trustees of the bondholders under the mortgage of July 15, 1868, for $7,000,000. The bondholders are numerous and widely scattered, and the plaintiffs holding the title to the railroad and property mortgaged to secure the bonds have a right, as representing the bondholders, to apply for judicial intervention to have the respective rights of the state and of themselves settled before any sale is made or attempted. If they are right in the position they take in the bill the state is wrong, and has no right to sell the road or offer to sell it. The effect of advertising the road for sale by the governor, under the advice of the attorney general and the able counsel associated with him, could not be otherwise than seriously to depreciate the value of the bonds secured by the mortgage to the plaintiffs; and this injurious effect would be greatly increased if a sale were

actually to be made in advance of a legal determination of the respective rights of the parties.

2. The next objection relates to the parties defendant.

It is insisted that "the governor and attorney general of Missouri cannot be enjoined in the federal court from proceeding under the statutes of the state to foreclose the state lien, unless those statutes are in conflict with the constitution of the United States."

This statement of the objection, taken from the brief of the learned counsel for the state, concedes, by implication, that if the statutes of the state do conflict with the federal constitution then the federal courts may, in a proper case, enjoin the agents or officers of the state. The mere fact that a state officer, whatever may be his grade, is a party, does not defeat the equity jurisdiction of the United States circuit court, although the state may be the real party in interest, and cannot, as such, be brought before the court. This was decided by the supreme court of the United States in the case of Osborne v. Bank of U. S., 9 Wheat. [22 U. S.] 783, and the doctrine has been frequently reaffirmed. It was asserted and applied by that tribunal during the present year, in the case of Davis v. Gray [16 Wall. (83 U. S.) 203]. The cases are there cited by Mr. Justice Swayne, and there is no call upon us to go over the same ground. In the case before us the state of Missouri is asserting simply the right of a creditor, or lien-holder, and not any right in her sovereign character. In the language of the supreme court of Missouri, "The governor, in the sale of the roads, is not acting in his political or executive capacity; he is not carrying out any of the powers delegated by the constitution: he is simply acting as a special agent, in obedience to power committed to him by an act of the legislature, which saw proper to intrust him with the particular function; but it might have devolved the duty upon any other person as well." State v. McKay, 43 Mo. 599.

If the fifth section of the act of March 31, 1868, is constitutional, it, and the proceedings had under it, and the deed of the governor, do constitute a contract between the state of Missouri and the company, which is under the protection of that provision of the constitution of the United States which prohibits a state from passing "any law impairing the obligation of contracts." Article 1, § 10. If that contract is valid, or the deed of the governor in 1868 to the company is effectual, any attempt by the governor, under the concurrent resolution of March 21, 1873, to enforce a lien which was satisfied, would be in violation of the rights of the company and its mortgage bondholders, and presents a fitting and proper case for the cognizance of the federal tribunals.

3. We are thus brought to the substantial question in the case, viz: the constitutionality of the fifth section of the act of 1868. We proceed to notice the several grounds upon which the state claims this section to be in violation of the constitution. It is urged that it is void because it was a special law, in contravention of the last clause of section 27 of article 4 of the constitution, by which it is provided that "the general assembly shall pass no special law for any case for which provision can be made by a general law, but shall pass general laws providing, so far as it may deem necessary, for the cases enumerated in this section, and for all other cases where a general law can be made applicable."

It is a sufficient answer to this objection to state that this is not one of the enumerated cases, and that the supreme court of the state of Missouri has recently decided that it is for the legislature, and not for the courts, to determine when a general law can be made applicable: State v. County Court of Boone Co., 50 Mo. 317. And such seems to be the prevailing view elsewhere taken: Cooley, Const. Lim. 129, note; Dill. Mun. Corp. § 26, and cases cited.

It is next insisted that the fifth section of the act of 1868 is void, because it violates section 32 of article 4 of the constitution of Missouri, which provides that "no law enacted by the general assembly shall relate to more than one subject, and that shall be expressed in the title; but if any subject embraced in an act be not expressed in the title, such act shall be void only as to so much thereof as is not so expressed." The title of the act of 1868 is, "An act for the sale of the Pacific Railroad, and to foreclose the state's lien thereon, and to amend the charter thereof." Similar provisions exist in many of the state constitutions, and they have been often construed to require only the general purpose (which must be a single one) of the statute to be fairly indicated by its title. Cooley, Const. Lim. 141–144; Dill. Mun. Corp. § 28, and cases cited. Different and incongruous subjects are not brought together in the act of 1868, but the provisions as to the sale of the road, and the foreclosure of the state's lien thereon, relate to but one subject within the meaning of the constitutional provision, and this subject is expressed in the title. The manner in which the lien of the state may be foreclosed will be considered hereafter.

It is next urged that the statutory lien in favor of the state was reserved by it, not exclusively for its own indemnity, but for the benefit of the holders of its bonds, and therefore the state, holding the lien merely as a trustee for its bondholders, could not release such lien while its bonds were outstanding, as they still are. None of the holders of these bonds are here, and it is not needful that we should inquire what equities they might have should the state refuse to pay them, and should they apply for relief against the railroad company or its property. I am inclined to think, however, that the form of the transaction indicates the intention of the parties. The state issued its bonds, and these

were negotiated and taken upon the state's "faith and credit," without any accompanying security. To indemnify itself, the state provided for, and received, a mortgage upon the road of the company, and a pledge of its net tolls and income. Then comes the further provision that the companies shall punctually pay the interest and principal of the bonds, but if they fail to do so, the state may sell the road to others, or buy it in itself, to be thereafter disposed of as the legislature may direct.

It could not be maintained, we think, that if a sale were made by the state to a third person, that he would take it subject to a lien in favor of the holders of the bonds of the state. Such a view seems to be inconsistent with the provisions of the act under which the aid was given, and the lien reserved to the state, with the provisions of the fourth and fifth sections of the constitutional ordinance, as expounded by the supreme judges (37 Mo. 129, 134), and with the entire state legislation on the subject of disposing of roads purchased by the state under the lien reserved to it. The judges, in their answer to the governor, distinctly say, that "when the state becomes the purchaser of the railroad, under the lien reserved, both the lien and the former company are extinguished. The state remains liable for her own bonds, and owns the railroad, and the state may sell it without reserving a lien for the whole indebtedness of the former company, but only for the unpaid balance of the purchase money." 37 Mo. 134.

But the principal objection to the fifth section of the act of March 31, 1868, is, that it is in conflict with section 4 of the constitutional ordinance, and with section 15 of article 11 of the constitution, before quoted. The constitutional ordinance, in the event of the default therein specified, directs that "the general assembly shall provide by law for the sale of the railroad, and other property, and the franchises of the company that shall be thus in default under the lien reserved to the state." Section 15 of article 11 of the constitution is, that "The general assembly shall have no power, for any purpose whatever, to release the lien held by the state upon any railroad."

By force of these provisions, it is insisted by the counsel in the interest of the state: (1) That the state legislature is thereby prohibited from making or authorizing any sale, unless by public auction; (2) that such sale must be for the whole amount of the bonds of the state; and (3) that the sale or disposition to the company, under the fifth section of the act of 1868, of the interest of the state under its lien is a release of the lien contrary to the fifteenth section of the eleventh article of the constitution, above quoted, and that it would be so, even though the state should receive from the company the full value of the property and interests covered by its statutory mortgage.

In neither the fourth nor the fifth sections of the constitutional ordinance, nor in the body of the constitution, can be found any provision fixing the price at which the roads shall be sold, either to third persons or to the state, and if bought by the state, at what price they shall be resold to others. Of this opinion, it seems, were the state supreme judges, for, in their official answer to the governor, they say: "If the state could never sell the road without reserving a lien for the whole indebtedness of the former company to the state, she might never be able to sell at all, and so be in a worse condition than she was before." 37 Mo. 134. There being no restriction in the constitution or organic law as to the amount at which the roads might be sold, it follows that this was a matter wholly within the control of the legislature, and that counsel are mistaken in supposing that any sale by the state must be for the whole amount of bonds issued or guaranteed by the state, and the interest thereon. No such construction, so far as I can discover, has ever been adopted in any legislative act, but always the contrary one; and sales for vastly less than the lien of the state have been legislatively authorized or confirmed, and such confirmation approved by the supreme court. See, on this point, the case of State v. McKay, 43 Mo. 594, relating to the sale by the state of the Iron Mountain road. Accordingly this very act of March 31, 1868, provided, if $8,350,000 should not be bid or realized at the sale, that the governor should buy in the road in the name of the state; and the state, in case a sale was made, assumed $700,000 and interest due on the bonds issued by the county of St. Louis, and also $650,000 of the floating debt of the company. The state therefore authorized a sale of this road for $7,000,000 net, which was confessedly some millions less than the amount for which the company is liable on account of the state bonds. It can scarcely be doubted if such a sale had been made that the purchaser would have obtained, as against the state, a perfect title, and yet the state would have received but $7,000,000.

The practical effect of such a sale would have been to annihilate all the stock and all the interest of the stockholders in the road. The stock of counties and municipalities of the state, obtained in exchange for their bonds, would have been sacrificed, except the amount assumed for St. Louis county. The floating debt of the company, except the portion assumed by the state, would never have been paid.

But such a sale was not made, for by the fifth section of the act the company, in consideration of $5,000,000 paid to the state, received a "full discharge from all claims or debts due the state, and all liability growing out of the issue of the bonds of the state to aid in the construction of its road." This left the corporation in esse—preserved the stock and the interest of the stockholders—and gave to the unsecured creditors of the

company the opportunity to obtain payment from it. If it were in the province of the court to pass judgment as to whether it were better to have sold to others outright for $7,000.000 net, with the consequences above pointed out, or to the company for $5,000,000, could we say that the legislature acted unwisely in adopting the fifth section?

In examining the transaction, we must look at substance rather than form—and in effect it was a sale of the state's interest to the company for $5,000,000. The legislature had the power to order a sale, and not being restrained by the constitution, it necessarily had the power to fix the price and terms of the sale. It could have authorized the sale for $5,000,000 to a third person—why not to the company for the same amount? There being no limitation in the constitution as to the price at which the general assembly might authorize the state to sell the road or to buy it in, or to re-sell it, the amount which the state would fix upon as the value of its security would, after all, depend upon legislative judgment. If the state had purchased for the $8,350,000 it might afterwards have sold it for any price it might see fit to take, whether more or less than that sum. The state agreed to take and did receive from the company the $5,000,000. The money was raised upon the mortgage and bonds which the present plaintiffs are here to protect. This mortgage was made and the money borrowed on the faith of the action of the state, and it was by this that the $5,000,000 were secured which was paid to the state and which it still retains. It was by this means that $1,500,000 of the Dresden bonds secured by a first lien on the west sixty-five miles of the road were paid. A second mortgage for $3,000,000 was made, and the money thus borrowed is alleged, and the answer does not deny the allegation, to have been used in ironing, repairing, and equipping the road. It is plain that this money was advanced on the faith of the legislation of 1868, and this appears on the face of the mortgage to the plaintiffs. These mortgages would have been worthless securities if it had been understood that the state still had a lien upon the road for the $7,000,000 and the nine or ten years' interest thereon, and this fact the state must be taken to have known when it received the $5,000,000, which was really the money of the bondholders and not of the company. Five sessions of the general assembly of Missouri met before any steps were taken to question the validity of the transaction in 1868; and it is manifest that that transaction cannot now be overthrown except by sacrificing the interest of men who have in good faith parted with their money on the strength of the legislation, acts, conduct, and acquiescence of the state. Looking back upon the transaction, I cannot say that the agreement to release the security of the state for $5,000,000 should, under the circumstances, and as respects the innocent mortgagees of the company, be held

NOTE. Provision of constitution requiring subject to be expressed in title of legislative act: State v. Miller, 45 Mo. 495; State v. Lafayette County Court, 41 Mo. 39; People v. Hills, 35 N. Y. 449; People v. Commissioners of Highways, 53 Barb. 70; Chiles v. Monroe, 4 Metc. (Ky.) 72; Dill. Mun. Corp. § 28, and cases cited; Cooley, Const. Lim. 81, 141, and cases cited.

The New York constitution of 1846 (section 4, art. 7) contained the following provision: "The claims of the state against any incorporated company, to pay the interest and redeem the principal of the stock of the state loaned or advanced to such company, shall be fairly en-

forced, and not released or compromised." In the case of Darby v. Wright [Case No. 3.574], this provision was construed, and subsequent legislation, authorizing, on certain conditions, a railroad company to issue its bonds to relay the road and complete certain improvements, and providing that such bonds should have priority of lien over the mortgage to the state, was sustained. The opinion of Hall, J., tends to sustain the conclusion reached in the principal case.

[NOTE. A perpetual injunction was granted. Case unreported. The cause was taken, on an appeal, to the supreme court, where the decree of this court, awarding the injunction, was affirmed; Messrs. Justices Miller and Davis dissenting. 22 Wall. (89 U. S.) 351.]