AUGUST JOHNSON, Respondent, v. THE UNION
    PACIFIC COAL COMPANY, a Corporation, Ap-
    pellant.

No. 1510.   (76 Pac. 1089.)

1. **Master and Servant: Injury to Servant: Instructions:
    Liability of Master.**
Where an employer engaged in constructing a railway track
    in a mine shaft let down the rails used in constructing the
    track without their being fastened to the car on which they
    were being conveyed, so that one of the rails slipped over
    the end of the car and fell on and injured an employee
    working at the bottom of the shaft, the employer is liable
    for the injuries, in the absence of proof that the mode of
    letting the rails down was the same, or equally as safe,
    as the mode in general use by men of ordinary prudence
    in the same kind of business.[1]

2. **Same: Lex Loci.**
In an action for personal injuries the law of the place where the
    injuries occurred governs.[2]

3. **Same: Statute of Wyoming: Common Law of England:
    English Decisions.**
Rev. St. Wyo. 1899, section 2695, provides that the common
    law of England, as modified by judicial decisions, so far as
    the same is of general nature and not inapplicable, and all
    declaratory or remedial acts or statutes made in aid there-
    of or to supply defects therein, etc., shall be the rule of de-
    cision in that state. *Held*, that, though the phrase "com-
    mon law of England," used in the statute, does not include
    the judicial decisions of England rendered subsequently to
    July 4, 1776, yet as evidence of what the common law as
    adopted is they are entitled to respect, and in particular
    cases may properly be regarded as conclusive.

---

[1] Pool v. Southern Pac. Co., 20 Utah 210, 58 Pac. 326; Dickert
v. Salt Lake City Ry. Co., 20 Utah 394, 59 Pac. 95; Boyle v. Union
Pac. Ry., 25 Utah 422, 430, 71 Pac. 988, 991.
    [2] Sartin v. Oregon Short Line Ry. Co., 27 Utah 447, 76 Pac. 219.

4. **Same.**

The common law of England, at the time of its adoption by Rev. St. Wyo. 1899, section 2695, had no relation whatever to the master's liability for injuries to a servant; and hence the decisions of the English courts prior to the adoption of the employer's liability act (1880) are not binding on the courts in a case involving the right of a servant to recover from his master for injuries received while in the service of the master.

5. **Same: Question for Jury: Evidence.**

In an action by an employee for injuries received while working at the bottom of a mine shaft by the slipping of a rail from the top of a car on which rails were being conveyed without being fastened to the car, whether the manner of sending the rails down was negligent, when an issue in the case, is a question for the jury, in the absence of evidence indicating negligence on the part of fellow servants of the injured employee, but showing that defendant's head foreman was present and directing the operation.

6. **Same: Law of Wyoming: Fellow Servants.**

It is not law in the state of Wyoming that persons employed in the same general work of the master are fellow servants.

7. **Same: Vice Principals.**

Persons engaged in the service of the master, who are intrusted by him with the management or direction of his general work, or with some particular part thereof, are not fellow servants with the subordinate employees, but vice principals.

8. **Same: Duty of Master: Promulgation of Rules.**

It is the duty of the master, when the nature of the business requires it, to make and promulgate rules for the protection of his servants, and to use due care and diligence after the making and promulgating of a necessary rule, to have it enforced.

9. **Same: Question for Jury.**

Whether a master was negligent in making and promulgating rules for the protection of his servants or in failing to use due care and diligence, after the promulgation of a necessary rule, to have it enforced, is, under evidence from which reasonable men might differ as to whether the duty has been performed, a question for the jury.

10. **Same: Instructions: Whole Case Covered: Error.**

Where instructions given cover the whole case, and properly submit it to the jury, error cannot be predicated of the refusal of the court to charge on other questions of minor importance.[3]

11. **Same: Evidence: Conditions Prior to Accident: Admissibility.**

In an action by an employee to recover for injuries resulting from being struck by a rail which fell off a car on which it and others were being sent to the bottom of a mine shaft where plaintiff was working, it was alleged in the complaint that on the day of the injury, and long prior thereto, by reason of the weight of the rails, the downward slope of the shaft, and the jerking of the cable, by which the car was controlled, the letting down of the rails was very dangerous, and that defendant had full notice thereof. These allegations were denied in the answer. *Held*, that testimony of a witness, who was with the car at various times and places in the same slope prior to the accident, was admissible to show the movement of the car when in operation going down into the shaft, though he was not present at the time of the injury.

12. **Same: Opinion Evidence: Admissibility.**

In an action by an employee to recover for injuries resulting from being struck by a rail which fell from a car on which it and others were being sent to the bottom of a mine shaft, where plaintiff was working, where the relative safety of different methods used in letting the cars down into the shaft was not an issue, opinion evidence concerning the relative safety of methods was inadmissible.

13. **Same: Expert Evidence: Admissibility.**

In an action by an employee to recover for injuries resulting from being struck by a rail which fell from a car on which it and others were being sent to the bottom of a mine shaft, where plaintiff was working, the relative safety of different methods used in letting cars down into the shaft is a question for the jury, and hence expert evidence is not admissible to show which method is the safest.

[3] State v. Haworth, 24 Utah 398-425, 68 Pac. 155, and cases cited; Holland v. Oregon Short Line R. R. Co., 26 Utah, 209, 72 Pac. 940.

(Decided May 28, 1904.)

Appeal from the Third District Court, Summit County.
—*Hon. C. W. Morse,* Judge.

Action to recover damages for personal injuries alleged to have been received because of the negligence of the defendant. From a judgment in favor of the plaintiff, the defendant appealed.

AFFIRMED.

*Le Grand Young, Esq.,* and *W. H. Hatteroth, Esq.,* for appellant.

*Lindsay R. Rogers, Esq.,* for respondent; *M. E. Wilson, Esq.,* and *John A. Street, Esq.,* of counsel.

BASKIN, C. J.—It is alleged, in substance, in the complaint, that the plaintiff, as an employee of the defendant, was, on the fifth of December, 1901, engaged in working in defendant's coal mine, in the State of Wyoming, at the bottom of a shaft in said mine, which extended from the surface, on an incline of twenty-five degrees, a distance of about eight hundred feet; that on said day the defendant was, and for a long time prior thereto had been, engaged in constructing a railway track down said shaft; that in doing so the iron rails necessary to the construction of said track were loaded upon the top of an ordinary pit car, and let down to the place where needed by means of a wire cable operated by machinery at the surface; that by reason of the weight of the rails, and the downward slope of said shaft and the jerking of the cable, the letting down of the rails was extremely dangerous to the plaintiff, working at the bottom of the shaft, by reason whereof it became and was the duty of the defendant to securely fasten the rails to the top of the car by means of ropes, cables,

28 Utah—4

or otherwise, and carefully work and operate the machinery, and to warn the plaintiff at the bottom of the shaft before letting down the pit car loaded with rails, and that the defendant had full notice of such risks, dangers, and hazards, and was well aware of its said duties; that on said day said defendant, in violation of its duty to the said plaintiff, negligently and carelessly, and without any notice or warning to the plaintiff, used said pit car in letting down said rails to the bottom of the shaft, and carelessly and negligently failed and omitted to fasten or secure said rails to the top of said car, but left the same loose and unfastened upon the top of said car, whereby and by consequence of which one of the said rails, being loose and unfastened, as aforesaid, on the top of said car, slipped from and over the end of said car, and fell down the slope of the shaft to the bottom thereof, where it struck the said plaintiff and injured him. In addition to the foregoing, it is alleged in the second count of the complaint ''that it became and was the duty of the defendant to make, prescribe, promulgate, and enforce rules among its said employees who were engaged in letting down said rails to the bottom of the shaft, requiring that said rails were by said employees to be securely fastened or tied to said pit or trip car by and with the said cables, ropes, or other effective appliances before said pit car loaded with said rails was started down the slope of the shaft. It is further, in substance, alleged that the defendant negligently failed and omitted to perform said duties. A verdict and judgment were entered in favor of the plaintiff.

At the close of the plaintiff's evidence the defendant moved for a nonsuit, which was denied. Defendant also requested the court to instruct the jury to return a verdict in favor of the defendant, which was also denied. The denial of each of these motions is assigned as error.

Without stating the evidence in detail, as it is very voluminous, it is sufficient to say that, after a careful

consideration of the whole of it, we are fully satisfied that it, as well as the evidence of the plaintiff in chief, standing alone, is such as required the case to be submitted to the jury, and that, therefore, the trial court did not err in denying either the motion for the nonsuit or the request to instruct the jury to find a verdict for the defendant.

2. The refusal of the court to give the following instructions, requested by the defendant, is also assigned as error, viz.: "The court further charges you, in the matter of what is a reasonably safe way to do a thing or perform an act, may be defined to be the way and manner that people engaged in the same business have adopted for doing like work. If you find from the evidence that the defendant adopted the ordinary and usual way of lowering the rails into its mines, which was the way that was adopted generally by mine owners in like cases, then in that event it would not be deemed carelessness or negligence on defendant's part to lower rails into the mine in this manner; and, if an accident occurred thereby, it would be an accident incident to the business, and one for which the defendant is not liable." It is well settled that the master is required to exercise "reasonable or ordinary" care for safety of his servants, while performing their duties. Reasonable care and ordinary care, which in law have the same meaning, "is the care which reasonable and prudent men use under like circumstances" (Cayzer v. Taylor, 10 Gray 274, 69 Am. Dec. 317), and must be measured by the character, risk, and exposure of the business; and the degree required is higher where life or limb is endangered. As stated by Mr. Justice Field in the Nitro-Glycerine Case, 15 Wall. 524-538, 21 L. Ed. 206: "The measure of care against accident, which one must take to avoid responsibility, is that which a person of ordinary prudence and caution would use if his own interest were affected and the whole risk were his own." In the case of Boyle v. Union Pac. R. Co., 25 Utah 422, 430 , 71 Pac. 988, 991, which the appellant has

cited as supporting its contention, Mr. Justice Mc-
CARTY, speaking for this court, correctly stated the rule
upon this subject as follows: "The rule has become ele-
mentary that it is a duty the master owes to his servant
to use reasonable care and prudence for his safety by
providing the machinery in use with such appliances
as will enable the servant, with ordinary and reasonable
care on his part, to perform the duties required of him
without danger, except as may be reasonably incident
to the business or employment engaged in.   That is,
the master is required to provide the same kind of ap-
pliances, or appliances equally as safe, as those in gen-
eral use by men of ordinary prudence who are en-
gaged in the same kind of business.   Bailey's Mast.
Liab., pp. 15, 16, and cases cited; Shearman & Redfield,
Neg., sec. 194; Pool v. Southern Pac. Co., 20 Utah 210,
58 Pac. 326.   It is not only the master's duty to pro-
vide his servants with reasonably safe appliances, but
it is also his duty to use ordinary care in looking after,
inspecting, and keeping them in repair.   Shearman &
Redfield, Neg., sec. 195; Bailey's Mast. Liab., p. 101."
The same rule is stated in Titus v. Railroad Co., 136
Pa. 618, 626, 20 Atl. 517, 518, 20 Am. St. 944, which the
appellant also cited as follows:   "No man is held by law
to a higher degree of skill than the fair average of his
profession or trade, and the standard of due care is
the conduct of the average prudent man."   In Dickert
v. Salt Lake City Ry. Co., 20 Utah 394, 59 Pac. 95, this
court held that:   "However usual the method of a com-
mon carrier, such as a street railway company, in start-
ing its cars, if that method is dangerous, and its use
violative of the high degree of care which the carrier
is required to observe regarding its passengers, and in
the use of that method a passenger is injured, the car-
rier is liable."   Reasonable or ordinary care cannot be
determined abstractly, for what would be such care in
one case, might be gross negligence in another, and
therefore whether such care has been exercised depends
upon, and can only be determined by, the facts in each

particular case, and is generally a question of fact for the jury to determine. Under the well-settled rule upon the subject before mentioned, the instructions so as aforesaid requested are erroneous in this: that they are not limited in their application to the reasonable or ordinary manner in which similar work as that in which the defendant was engaged is generally performed, under similar circumstances, by reasonable and prudent persons engaged in the same occupation. As there was no proof that the conditions under which the work of the defendant was performed were the same as those under which reasonable and prudent persons engaged in the same occupation as the defendant generally perform their work, the instructions requested were not proper for that reason.

3. Defendant's attorney asked M. J. Blake, a witness for defendant, "What was the general method of letting down rails in those mines you say you have worked in, in the State of Wyoming, prior to the time of this accident?" To this question counsel for plaintiff objected on the ground that it was incompetent, and did not include conditions existing at the time and place of the accident. This and several objections of the same kind were sustained, and the ruling of the court is assigned as error. It follows from what has been said under the second head of this opinion that these objections were properly sustained.

4. The refusal of the court to give each of the following instructions, requested by the defendant, is assigned as error:

"(5) You are instructed that when the plaintiff engaged in the employment of the defendant for compensation he took upon himself the risks and perils ordinarily incident to the performance of the service for which he was employed. That one of the risks and perils, under the laws of Wyoming, so assumed by the said deceased, is that resulting from the carelessness and negligence of the other servants in the same general employment. If you, therefore, find from the evidence

that the accident resulted from the negligence of the engineer operating the hoisting engine, or from the negligence of any of the men who were employed in taking rails down the slope, then and in either of said cases plaintiff could not recover in this case, for the reason that the accident was caused by the omission or act of a fellow servant with the deceased, for which omission or negligence the said defendant is not liable.

"(9)  The court instructs you that the defendant in this case is not liable for any neglect or misconduct of the fellow servants of plaintiff which may have caused his injury, and further charges you that Mr. Tait and Mr. McDonald and other men under Mr. Blake were fellow servants with the plaintiff, and if, therefore, the accident happened because of the negligence of these men to obey the orders of Mr. Blake, the mine boss, to fasten the rails upon the car, you will find no cause of action against the defendant.

"(12)  You are instructed that where two or more persons are employed in the same general work by a company, if one is injured by the negligence of the other his employer is not responsible.  The court further charges you that Mr. Blake, the mine foreman, and Mr. Tait, his assistant, and Mr. McDonald, and the others loading the cars with the iron rails in question, were fellow servants of the plaintiff in this case."

The first sentence of the fifth request was given in the court's charge.  Appellant's counsel contend that the case at bar is governed by the common law of England on the subject of the liability of the master for injuries to the servant, as adopted by section 2695 of the Revised Statutes of 1899 of the State of Wyoming, and for that reason the requests should have been given. Said section is as follows: "The common law of England as modified by judicial decisions so far as the same is of a general nature and not inapplicable, and all declaratory or remedial acts or statutes made in aid of, or to supply the defects of the common law, prior to the fourth year of James the First (excepting the second

section of the sixth chapter of forty-third Elizabeth, the eighth chapter of thirteenth Elizabeth and ninth chapter of thirty-seventh Henry Eighth) and which are of a general nature and not local to England, shall be the rule of decision in this State when not inconsistent with the laws thereof, and shall be considered as of full force, until repealed by legislative authority." This court has held that the law of the State where the injury occurs, governs. Sartin v. Oregon Short Line R. Co., 27 Utah 447, 76 Pac. 219. To determine the question thus presented it is necessary to ascertain what the phrase "common law of England," as used in said section, includes. Blackstone, in defining the "common law of England," uses the following language: "The municipal law of England . . . may with sufficient propriety be divided into two kinds: The *lex non scripta*, the unwritten or common law; and the *lex scripta*, the written or statute law. The *lex non scripta*, or unwritten law, includes not only general customs, or the common law properly so called, but also particular customs. . . . Their original institution and authority are not set down in writing, as acts of Parliament are, but they receive their binding power and force of law by long and immemorial usage, and by their universal reception throughout the kingdom. . . . Whence it is that in our law the goodness of the customs depends upon its having been used time out of mind; or, in the solemnity of our legal phrase, time whereof the memory of man runneth not to the contrary. This is it that gives it its weight and authority; and of this nature are the maxims and customs which compose the common law, or *lex non scripta*, of this kingdom." 1 Sharswood's Blackstone's Com. 63-66. See, also, Broom's Comm. on Common Law (4 Ed.), p. 7. The *lex non scripta*, or common law of England, was brought over to the American colonies by our ancestors, and was adopted by them so far as applicable to their new conditions, and has been adopted by most of the States in the Union substantially in the same form as by the

State of Wyoming. It is stated in 8 Cyc. 386, that: "In determining what the common law is, the courts will consider as evidence, although not as conclusive, Blackstone's and Kent's Commentaries and other standard works on the subject; and will examine and weigh the reasoning of the decisions of the State and Federal courts down to the present time. English decisions rendered prior to July 4, 1776, if they are clear and consistent, while they do not constitute a part of the common law, are usually considered conclusive evidence of what the common law is; but those rendered after that date, while entitled to great respect, are not binding upon us. The courts will also, in ascertaining the principles of the common law, consider English statutes amendatory or declaratory of the common law. English decisions construing English statutes adopted in the United States, made prior to their adoption, or prior to the Revolution, but not afterwards, will generally be followed." In 6 Am. & Eng. Enc. Law (2 Ed.), 279, it is stated that: "English decisions are freely used in deciding cases in the Federal and State courts in the United States, and are deemed of great value in these tribunals; and where such decisions were rendered prior to the war of the Revolution they form a part of the common law of the United States, and are binding upon American courts. But, though binding, they do not constitute the law itself, but are only evidence of what the law is, and hence should be clear and unequivocal. On the other hand, it is equally well settled that decisions of English courts rendered since that time, though entitled to respect, and at times regarded as persuasive, are not authoritative, and will be disregarded should the exigency so require."

In Murdock & Co. v. Hunter's Representative, 1 Brock. 135-140, Fed. Cas. No. 9941, Mr. Chief Justice Marshall, in the opinion, said: "On passing from principle to authority, it may not be improper to premise that, as the common law of England was and is the common law of this country, and as an appeal from the

courts of Virginia lay to a tribunal in England, which would be governed by the decisions of the courts, the decisions of those courts made before the Revolution have all that claim to authority which is allowed to appellate courts. Those made since the Revolution lose that title to authority, which was conferred by the appellate character of the tribunal which made them, and can only be considered as the opinions of men distinguished for their talents and learning, expounding a rule by which this country, as well as theirs, professes to be governed." The same doctrine was announced by the same distinguished judge in the cases of Livingston v. Jefferson, 1 Brock. 203, 210, 211, Fed. Cas. No. 8411, and in Cathcart v. Robinson, 5 Pet. 263. Chief Justice Shaw, in Commonwealth v. York, 9 Metc. (Mass.) 92-110, 43 Am. Dec. 373, announced the same doctrine in the following language: "If we consult English decisions made since the Revolution, it is not because they have any binding force as rules, but because they are expositions of the rules and principles of the common law by men of great experience and judgment in the knowledge and application of the same laws which we are seeking to expound. And if we read the digests and treatises of reputable authors published since we ceased to be English subjects, it is because they contain the authentic records of the precedents and judicial proceedings which furnish the evidence of the common law." See, also, Koontz v. Nabb, 16 Md. 549; Robert v. West and Reed, 15 Ga. 122; 1 Kent's Com. (13 Ed.), 473. Judge Cooley, in his work on Const. Lim. (7 Ed.), laid down the same doctrine, and on page 53 stated: "The opening of the war of the Revolution is the point of time at which the continuous stream of the common law became divided, and that portion which had been adopted in America flowed on by itself, no longer subject to changes from across the ocean."

In Cowhick v. Shingle, 5 Wyo. 87, 95, 37 Pac. 689, 692, 25 L. R. A. 608, 63 Am. St. Rep 17, Mr. Justice

Clark, speaking for the court, said: "As a rule, the term
'common law' means both the common law of England
as opposed to statute or written law, and the statutes
passed before the emigration of the first settlers of
America. Patterson v. Winn, 5 Pet. 241, 8 L. Ed. 108;
Commonwealth v. Leach, 1 Mass. 61. And applying
this definition to the matter in hand, I am unable to per-
ceive that there is any 'common law' rule upon the sub-
ject." The first section of the Washington Code of
1881 (2 Hill's Ann. St. & Codes, section 108, p. 34) is
as follows: "The common law, so far as it is not in-
consistent with the Constitution and laws of the United
States, or of the State of Washington, nor incompatible
with the institutions and conditions of society in this
State, shall be the rule of decision in all the courts of
this State." In the case of Sayward v. Carlson, 1 Wash.
St. 29-40, 23 Pac. 830, 833, which involved the question
of whether the plaintiff's injury was caused by a fellow
servant, the court, in its opinion, said: "Plaintiff in
error maintained that section 1 of the Code of 1881,
which makes the common law of England the rule of
decision in all the courts of Washington Territory, was
decisive as to the first step of the inquiry, namely, where
the court should look for the proper rules. We agree
to this. But we do not subscribe to the next proposi-
tion—that resort can be had only to the decisions of
English courts, or to those of American courts which
have followed them, to ascertain what the common law
of England is or was, unless the English decisions com-
mend themselves to reason, or have been so long and
generally followed that to depart from them would tend
to unsettle what has, by 'immemorial and universal
usage,' been understood to be settled. . . . And we
understand by section 1 of the Code that, where there
are no governing provisions of the written laws, the
courts of the late Territory, and of this State, are, in
all matters coming before them, to endeavor to admin-
ister justice according to the promptings of reason and
common sense, which are the cardinal principles of the

common law; but not that the decisions of English courts are to be taken blindly, and without inquiry as to their reasoning or application to the circumstances. We have been led to these remarks because of the fact that this question of injuries by servants of the same master negligently inflicted upon each other has given rise to extensive discussion and wide divergence of decision in both English and American courts."

In view of the foregoing authorities, I am clearly of the opinion that the phrase "common law of England," as used in section 2695 of the Wyoming Revised Statutes of 1899, was not intended and does not include the judicial decisions of England upon the subject rendered subsequently to the independence of America. But, notwithstanding such decisions are not a part of the common law adopted by the State of Wyoming, and are not, therefore, binding upon the courts of that State, yet, as evidence of what the common law, as so adopted, is, they are entitled to respect, and in particular cases may properly be regarded as conclusive. This brings us to the consideration of whether the common law so adopted is applicable to the case at bar.

The first decision in England upon the subject of the master's liability was rendered in 1837, in the case of Priestly v. Fowler, 3 Meeson & Welsby 1. The declaration in the case stated that: "The plaintiff was a servant of the defendant in his trade of a butcher; that the defendant had desired and directed the plaintiff, so being his servant, to go with and take certain goods of the defendant in a certain van of the defendant then used by him, and conducted by another of his servants, in carrying goods for hire upon a certain journey; that the plaintiff, in pursuance of such desire and direction, accordingly commenced and was proceeding, and being carried and conveyed by the said van, with the said goods; and it became the defendant's duty to use proper care that the van should be in a proper state of repair, and should not be overloaded, and that the

plaintiff should be safely and securely carried thereby. Nevertheless that the defendant did not use proper care that the van should not be overloaded, or that the plaintiff should be safely and securely carried, in consequence of the neglect of which duties the van gave way and broke down, and the plaintiff was thrown to the ground, and his thigh fractured.'' The judgment rendered upon the verdict for the plaintiff was, on motion, arrested. Lord Abinger, in the opinion, said: ''It has been objected to this declaration that it contains no premises from which the duty of the defendant, as therein alleged, can be inferred in law; or, in other words, that from the mere relation of master and servant no contract, and therefore no duty, can be implied on the part of the master to cause the servant to be safely and securely carried, or to make the master liable for damages to the servant arising from any vice or imperfection unknown to the master, in the carriage, or in the mode of loading and conducting it. . . . It is admitted that there is no precedent for the present action by a servant against a master. We are therefore to decide 'the question upon general principles, and in doing so we are at liberty to look at the consequences of a decision the one way or the other.''

The next decision on the subject in England was made in 1850, in the case of Hutchinson's Adm. v. The York, etc., Ry. Co., 5 Excheq. 343, and in the opinion it is said: ''This case appears to us to be undistinguishable in principle from that of Priestly v. Fowler, 3 M. & W. 1. . . . That case was fully considered, and the court, after a verdict for the plaintiff, arrested the judgment on the ground that a master is not, in general, liable to one servant for damages resulting from the negligence of another. . . . The principle is that a servant, when he engages to serve a master, undertakes, as between him and the master, to run all the ordinary risks of the service, and this includes the risk of negligence on the part of a fellow servant, whenever he is acting in discharge of his duty as servant of him

who is the common master of both. . . . Though
we have said that a master is not, in general, respon-
sible to one servant for an injury occasioned to him by
the negligence of a fellow servant while they are acting
in one common service, yet this must be taken with the
qualification that the master shall have taken due care
not to expose his servant to unreasonable risks.''

While as a general principle, it has been well set-
tled by the decisions of the courts of both England and
this country that the master is not liable for an injury
to the servant caused by the negligence of a fellow ser-
vant, it has likewise been settled that it is the duty of the
master to exercise due care, and use all reasonable and
ordinary means to prevent the servant from being ex-
posed to unnecessary danger, and if the master neglects
to perform that duty he is liable whenever such neglect
either directly causes or materially contributes in caus-
ing the injury. But as to what specific duties the master
is bound to perform in order to avoid liability, and as to
who are fellow servants, under these general principles,
the decisions of the courts of England, prior to the
employer's liability act of 1880 (43 and 44 Vict. c. 42;
Digest of Cases and Statutes (2 vol.), 2236), as also
the decisions of the courts of this country up to the
present time, widely differ. Some of the English cases
upon the subject previous to said act are as follows: In
the case of Tarrant v. Webb, (decided in 1856) 86 Eng.
Com. Law 797, it was held that ''a master is not gen-
erally responsible for an injury to a servant from the
negligence of a fellow servant, but that rule is subject
to this qualification; that the master uses reasonable
care in the selection of the servant.'' Lord Jervis, in
the opinion, quoting from the opinion of Lord Cran-
worth in the case of Patterson v. Wallace, 1 Macq. 748,
751, says: ''When a master employs a servant in a
work of a dangerous character, he is bound to take all
reasonable precautions for the safety of that workman.
This is the law of England no less than the law of Scot-
land. It is the master's duty to be careful that his ser-

vant is not induced to work under a notion that tackle or machinery is staunch and secure, when in fact the master knows, or ought to know, that it is not so. And if, from any negligence in this respect, damage arise, the master is responsible." In Murphy v. Smith, (decided in 1865) 115 Eng. Com. Law 361, it was held that: "To render a master liable for an injury to one in his employ through the negligence of another person also in his employ, it must be shown that the latter was placed by the master in such a position of trust and authority as to be fairly considered as his representative in the establishment." In Vose, Administratrix, v. Railway Company, (decided in 1858) 2 Hurl. & Nor. 728, it is said: "A servant in the employment of the E. L. Company engaged in repairing a carriage on a siding at a station in the joint occupation of the E. L. Company and the L. & Y. Company, was killed by an engine of the L. & Y. Company being shunted into the siding at which he was at work. It appeared that rules for the regulation of the station were published, headed in the joint names of the two companies, and that the servants employed in shunting the engines were the joint servants of the two companies, but the engine drivers and persons employed, as the deceased was, in repairing the carriage were the separate servants of each company. It was found that the rules as to the precautions to be taken before shunting trains into sidings had been observed, and that there had been no negligence on the part of the deceased, the shuntsman, pointsman, or engine driver, but that the accident was occasioned by the rules being defective. Held, that the L. & Y. Company were liable to an action at the suit of the administratrix of such servant." Clarke v. Holmes, (decided in 1862) 7 Hurl. & Nor. 937: "The plaintiff was employed by the defendant to oil dangerous machinery. At the time plaintiff entered upon the service the machinery was fenced, but the fencing became broken by accident. The plaintiff complained of the dangerous state of the machinery, and the defendant promised him that the

fencing should be restored. The plaintiff, without any negligence on his part, was severely injured in consequence of the machinery remaining unfenced. Held, in the Exchequer Chamber (affirming the judgment of the Court of Exchequer), that the defendant was liable for the injury." In the opinion Cockburn, C. J., said: "I consider the doctrine laid down by the House of Lords in the case of the Bartonshill Coal Company v. Reid as the law of Scotland with reference to the duty of a master as applicable to the law of England also, namely, that where a servant is employed on machinery from the use of which danger may arise it is the duty of the master to take due care, and to use all reasonable means, to guard against and prevent any defects from which increased and unnecessary danger may occur." Byles, J., also said: "I think the master liable on the broader ground, to-wit, that the owner of dangerous machinery is bound to exercise due care that it is in a safe and proper condition. The case of Priestly v. Fowler introduced a new chapter into the law, but that case has since been recognized by all the courts, including the Court of Error and the House of Lords. So that the doctrine there laid down, with all the consequences fairly deducible from it, are part of the law of the land. But the principles laid down in Priestly v. Fowler, and all the examples there given of their application, relate to the conveniences and casualties of ordinary or domestic life, and ought not to be strained so as to regulate the rights and liabilities arising from the use of dangerous machinery. . . . To hold that the master is responsible to his workman for no absence of care, however flagrant, seems to me in the highest degree both unjust and inconvenient. . . . It may be true that some of the cases cited at the bar are not quite consistent with this rule, particularly those which seem to make the personal misconduct or personal knowledge of the master a necessary ingredient in his responsibility. But we are a court of error, at liberty to decide on principle, and fortified by higher authority. Why may not

the master be guilty of negligence by his manager or agent, whose employment may be so distinct from that of the injured servant that they cannot with propriety be deemed fellow servants? And if a master's personal knowledge of defects in his machinery be necessary to his liability, the more a master neglects his business and abandons it to others the less will he be liable." To the same effect is the case of Murray v. Phillips, (decided in 1876) 35 Law Times Rep. 477.

The following quotation from the opinion in Hough v. Railway Company, 100 U. S. 221, 25 L. Ed. 612, further shows the views of English courts upon the subject, as well as the view of the Supreme Court of the United States up to the date of the decision, viz.: "The question came before the House of Lords in Patterson v. Wallace (1 Macq. H. L. Cas. 748), and again in 1858, in Bartonshill Coal Co. v. Reid, 1 Macq. H. L. Cas. 266. In the last-named case Lord Cranworth said that it was a principle, established by many preceding cases, 'that when a master employs his servant in a work of danger he is bound to exercise due care in order to have his tackle and machinery in a safe and proper condition, so as to protect the servant against unnecessary risks.' This he held to be the law in both Scotland and England. At the same sitting of the House of Lords, Bartonshill Coal Co. v. McGuire, 3 Macq. H. L. Cas. 307, was determined. In that case Lord Chancellor Chelmsford delivered the principal opinion, concurring in what was said in the Reid Case. After referring to the general doctrine as announced in Priestly v. Fowler, and recognized subsequently in other cases in the English courts, he said: 'In the consideration of these cases it did not become necessary to define with any great precision what was meant by the words "common service" or "common employment," and perhaps it might be difficult beforehand to suggest any exact definition of them. It is necessary, however, in each particular case to ascertain whether the fellow servants are fellow laborers in the same work, because,

although a servant may be taken to have engaged to encounter all risks which are incident to the service which he undertakes, yet he cannot be expected to anticipate those which may happen to him on occasions foreign to his employment. Where servants, therefore, are engaged in different compartments of duty, an injury committed by one servant upon the other by carelessness or negligence in the course of his peculiar work is not within the exception, and the master's liability attaches in that case in the same manner as if the injured servant stood in no such relation to him.' "

The particular acts of the master which entitle the servant to recover for injury caused thereby, were not definitely fixed by the law in England previous to the passage of the employer's liability act in 1880, the first and second sections of chapter 42 of which are as follows:

"Section 1. Where after the commencement of the act personal injury is caused to a workman, (1) by reason of any defect in the condition of the ways, works, machinery, or plant connected with or used in the business of the employer; or (2) by reason of the negligence of any person in the service of the employer who has any superintendence entrusted to him whilst in the exercise of such superintendence; or (3) by reason of the negligence of any person in the service of the employer to whose orders or directions the workman at the time of the injury was bound to conform, where such injury resulted from his having so conformed; or (4) by reason of the act or omission of any person in the service of the employer done or made in obedience to rules or by-laws of the employer, or in obedience to particular instructions given by any person delegated with the authority of the employer in that behalf; or (5) by reason of the negligence of any person in the service of the employer who has the charge or control of any signal, points, locomotive engine, or train upon a railway, the workman, or in case the injury results in death, the legal

28 Utah—5

personal representative of the workman, any persons
entitled in case of death, shall have the same right of
compensation and remedies against the employer as if
the workman had not been a workman of nor in the ser-
vice of the employer, nor engaged in his work.

"Section 2. A workman is not entitled under the
act to any right of compensation or remedy against the
employer in any of the following cases: (1) Under
subsection 1 of section 1, unless the defect therein men-
tioned arose from, or had not been discovered or rem-
edied owing to the negligence of the employer, or of
some person in the service of the employer, and en-
trusted by him with the duty of seeing that the ways,
works, machinery, or plant were in proper order. (2)
Under subsection 4 of section 1, unless the injury re-
sulted from some impropriety or defect in the rules, by-
laws, or instructions therein mentioned; provided that
where a rule or by-law has been approved or has been
accepted as a proper rule or by-law by one of Her Maj-
esty's principal Secretaries of State, or by the Board
of Trade or any other department of the government,
under or by virtue of any act of Parliament, it shall not
be deemed for the purposes of this act to be an improper
or defective rule or by-law. (3) In any case where the
workman knew of the defect or negligence which caused
his injury, and failed within a reasonable time to give,
or cause to be given, information thereof to the em-
ployer, or some person superior to himself in the ser-
vice of the employer, unless he was aware that the em-
ployer or such superior already knew of the said defect
or negligence." 2 Dig. of Eng. Cas., pp. 2236, 2237.

It follows from the foregoing facts and the decis-
ions mentioned upon the subject that the common law
of England, at the time of its adoption by the State of
Wyoming, had no relation whatever to the master's
liability for injuries to the servant, and that the de-
cisions of the English courts prior to the adoption
of the employer's liability act are not binding upon us
in the case at bar.

It appears that the engineer mentioned in the fifth request was at the time the plaintiff was injured, and previously thereto had been, in charge of the defendant's engine, but there was no evidence whatever tending to show that he was negligent in any respect. It also appears that the witness Blake at the time of the injury was and had been defendant's "mine foreman," and that both he and the witness Tait, who was assistant foreman, were present while the rails (among which was the rail by which the plaintiff was injured) were being loaded. Mr. Blake, as appears from the following questions asked him by defendant's counsel and his answers to the same, directed the loading of the rails, and knew the manner in which it was done: "Q. Mr. Blake, you say you were present the morning—afternoon at least—this party was injured, and I will ask you again now if you were there when the rails were loaded that went down the trip from which Mr. Johnson was hurt? A. I had been around there. Q. Were you present at the time? A. Not all the time. Q. Were you there at all? A. Yes, sir; part of the time. Q. State whether or not you superintended loading those rails, or instructed them to be done. A. I instructed them. I didn't personally superintend. Q. State how those rails were loaded so far as you know. A. They were loaded on the trip of about five empty cars. Q. How? A. On the last car, front end of the trip going down the slope. There were two pieces of three by ten and one piece of three by twelve plank placed in the end of the car, and in the bed of the car— Q. Did they stand endways? A. Yes, stand endways in the bed of the car. The bed of the car was then filled up within three or four inches of the top with mine ties. Q. Three or four inches of the top? A. Yes, sir. Q. And then what? A. And the rails were loaded on the top of the trip and placed against the plank. Q. Did you see the men load the rails? A. Yes, sir." Mr. Tait testified that he was present and assisted in loading the rails, and in answer to the question by defendant's counsel, "Under whose super-

vision were the rails loaded?" said, "Mr. Blake's." Mr.
Tait, as assistant foreman, had control over the miners
and track layers, and Mr. Blake, the mine foreman, had
control over all of the men, and had power to hire and
discharge them.    No one engaged in the work had au-
thority superior to that of Mr.   Blake's.    There was no
evidence to show that the employees in conducting the
cars down the shaft were negligent, or did it in any dif-
ferent way than required by their instructions.

No statute of Wyoming upon the subject of the
master's liability has been called to our attention, and
the only decision in that State relating thereto which
we have been able to find was rendered in the case of
McBride v. Union Pac. R. R. Co., 3 Wyo. 248, 21 Pac.
687, cited by appellant's counsel as supporting their con-
tention.    In that case the "plaintiff had been ordered
by the gang boss to assist in lowering an engine in de-
fendant's shops.    The engine was hoisted above the
track, and was resting on timbers, which in turn were
resting on the rails, and above a pit two or three feet
deep.    In removing the last timber but three men were
employed, plaintiff being on the right-hand side, and J.
and E. on the left.    By order of the boss, J. left the work,
and the end of the timber held by E. dropped into the
pit causing the other end to fly up and hit plaintiff, in-
flicting the injuries complained of.    The jury found that
the gang boss had immediate control of the work, but
that he was under the general control of the master me-
chanic; that the latter was not in the shops at the time,
but that the foreman, who superintended the work in
the shops under the general directions of the master me-
chanic was present. Held, that the defendant could not be
held liable for the negligence of the gang boss as a vice
principal in the exclusive control of a department." In
the opinion, delivered by Mr. Justice Corn, it is said:
"None of the authorities, we believe, go to the length
of holding the master liable for negligence of an employee
as vice principal in control of a department, when there
is in the same department, and present at the time of

the accident, a superior under whose orders and control such employee performs his duties. There is, however, a class of cases where the employee is the representative of the master, though not in control of a separate department; and where the master is liable for his negligence, not upon any ground of superior rank or grade in the service, but from the character of the service which he is designated to perform. 'One of the exceptions to the general rule of the common law that the master is not liable to one employee for the negligence of a coemployee in the same service arises from the obligation of the master, whether a natural person or a corporate body, not to expose the servant, when conducting the master's business, to perils or hazards against which he may be guarded by proper diligence upon the part of the master.' Railroad Co. v. Fox, 31 Kan. 597, 3 Pac. 322. Such proper diligence imposes upon the master such duties as to furnish to the men a reasonably safe place in which to work, to furnish them proper and safe machinery and materials with which to work, to exercise reasonable care and diligence in making sufficient regulations for the safe running of trains, so as to avoid injury from collision, etc., to furnish sufficiently skillful coemployees and in sufficient number for the safe performance of any particular piece of work in which an employee is called upon to take part,'' etc.

The same exceptions referred to by Justice Corn have been made in the statutes of several of the States, are the same as those mentioned in some of the English cases before cited, and are among the exceptions set out in the employer's liability act of 1880. Independent of statute, they are, in principle, correct, and are sustained by public policy and the decisions of many well-considered cases by the courts in this country. Under these exceptions a person intrusted by the master with the management of his general business, or with some special part of it, is not a fellow servant with the subordinate employee. The duties imposed by these exceptions are personal duties of the master, which can in

no way be delegated by him so as to relieve him from liability. Nor is the negligence of the person to whom the management of the master's business is intrusted among the risks of the employment which the servant assumes. As Blake, the foreman, and his assistant, were both present when the rails were being loaded, the former directing and the latter assisting the men engaged in the work, if the manner of loading the rails upon the cars was negligent, and in consequence thereof, as alleged in the complaint, one of the rails on the top of the cars, being loose and unfastened, fell down the slope, and injured the plaintiff, it was the negligence of the foreman and his assistant, and not that of the employees working under them. Whether the manner was negligent was in issue, and, under the evidence, was a question for the jury to determine. The case at bar is distinguishable from the Wyoming case in this: The plaintiff was not, as in that case, present and assisting in the operation which caused the injury. Nor was the head foreman in that case, as in the case at bar, present and directing the operation.

It follows from what we have said that all of the requests under consideration were properly refused, first, because, it is not the law in the State of Wyoming that "persons employed in the same general work" of the master are fellow servants, and on principle, and by the weight of authority, persons engaged in the service of the master, who are intrusted by him with the management or direction of his general work, or with some particular part thereof, are not fellow servants with the subordinate employees, but are vice principals; and, second, under the evidence the alleged negligence is not attributable to either the engineer or the subordinate employees who assisted in loading the rails upon the cars.

5. The appellant also has assigned as error the giving of the following instruction: "(7) It is the duty of the master, when the nature of the business required it, to make and promulgate rules for the protection of his

servants, and to use due care and diligence, after the making and promulgating of a necessary rule, to have it enforced; and if you should find from the evidence in this case that the nature of the defendant's business was such as, in the exercise of due care and prudence for the safety of its employees, required the making and promulgating of rules, and should further find that the defendant failed to make and promulgate such rules, or having made and promulgated the same, failed to use due care and diligence to have them enforced, and should further find that the injuries, if any, received by the plaintiff were caused by such failure, you should find for the plaintiff.''

The following rule, stated in Barrows on Negligence, p. 102, sec. 40, is generally sustained by both courts and text-writers, to-wit: ''It is the duty of the master to prescribe and publish such suitable rules as the circumstances may reasonably require for the proper and safe transaction of the business. This duty of the master to protect his servants by making suitable rules for the safe management of the business, becomes more imperative in proportion to the danger and complication of the work; but whether any rule at all is required, in the exercise of ordinary care, in a particular case, or whether the one in effect at the time of the injury was reasonably sufficient, are generally questions of fact for the jury. . . . And the master must also exercise ordinary care to see that the rules and regulations are enforced.''

A failure upon the part of the master to perform this duty is negligence *per se.* Wood on Mast. & Serv., sec. 403. Whether this duty has been performed depends upon the circumstances of each particular case; and when the evidence, as in this case, is such as reasonable men might differ as to whether the duty has been performed, it is a question for the jury.

In Eastwood v. Retsof Mining Co., 86 Hun 91, 96, 34 N. Y. Supp. 196, 198, the court said: ''It is quite clear in this case that the question whether or not the

case was a proper one for requiring the defendant to establish rules for the government of its employees in drawing salt from this bin when men were engaged inside of it was one as to which reasonable men might differ . . . . In every case its duty is performed by the exercise of reasonable care in deciding in the first place whether rules are necessary, and, in the second place, in making such rules as appear to be sufficient. But the question in either case may be for the jury whether, in the first place, the company took reasonable care to conclude whether rules were necessary, or, in the second place, if they were, whether the rules thus made were proper for the purpose for which they were intended. When the question is whether the case was one in which rules ought to have been made, the fact that other people or corporations engaged in the same business had or had not found it necessary to make rules upon that subject, is one that might well be considered. But the fact that no such rules had been made is not conclusive against the necessity of making them. It is simply a fact to be considered.'' Under the circumstances disclosed by the evidence, the instruction under consideration correctly stated the law, and properly submitted to the jury the question as to whether the defendant in respect to the matter of making, promulgating, and enforcing necessary rules, was negligent.

6. In addition to the instructions hereinbefore mentioned, requested by the defendant, ten others were asked for by it, and the refusal of each is assigned as error. As the instructions given by the court covered the whole case, and properly submitted it to the jury, the other ten requests being of minor importance, it is not necessary to pass upon them. State v. Haworth, 24 Utah 398-425, 68 Pac. 155, and cases there cited; Holland v. Oregon Short Line R. R. Co., 26 Utah 209, 72 Pac. 940.

7. In the examination in chief of a witness for the plaintiff the following occurred: ''Q. Now tell just the movement of the car when it was in operation down

that slope? A. I could not say for that car or that trip at the time. Q. Other trips?" Defendant's counsel objected to these questions as incompetent in this: that what may have been done at other times was not evidence of what was done on the occasion of the injury. The objection was overruled, and the witness answered: "I was with it at various times and places in that slope during my employment prior to this accident. At times it would run steady, and at other times it kind of jerked." It is, in substance, alleged in the complaint that on the day of the injury, and long prior thereto, by reason of the weight of the rails, the downward slope of the shaft, and the jerking of the cable, the letting down of the rails was very dangerous to the plaintiff, and that the defendant had full notice thereof. These allegations were denied in the defendant's answer. In view of that fact the objection was properly overruled.

8. A witness for the defendant was asked by its counsel the following question: "Mr. Hopkins, after your experience and investigation in these matters, which is the better or safer way of letting down those rails in the mine in question, by placing, as was done formerly, against plank—the end of the rail against plank—raised above the surface of the car behind (that is, the one in vogue at the time of the accident), or the one you now say they adopted by hanging them on an iron rod." The question was objected to by the plaintiff as incompetent, and calling for an opinion upon a matter which it was the province of the jury to decide. As to which of the methods referred to in the question was the safest was not an issue in the case, and the opinion called for related to a matter which, if it had been the issue, would have been a question exclusively for the jury, and therefore not the subject of expert opinions.

Upon a careful examination of the whole record we fail to discover any reversible error.

The judgment is affirmed, with costs.

McCARTY, J., concurs. BARTCH, J., concurs in the judgment.