ERNST SCHMIDT v. UNION ELECTRIC LIGHT & POWER COMPANY, Appellant.—3 S. W. (2d) 384.

Division One, March 3, 1928.

*Rassieur & Goodwin* for appellant.

*William A. Kane* for respondent.

RAGLAND, J.—This is an appeal from the Circuit Court of the City of St. Louis, wherein respondent, an employee of appellant, obtained a judgment for $10,000 for personal injuries sustained in the course of his employment, through the alleged negligence of his employer.

The facts are not complicated, though the evidence with respect to some of the situations dealt with is far from clear. Appellant at the times hereinafter referred to was a large manufacturer of electrical energy. It maintained an extensive plant at the foot of Ashley Street in the city of St. Louis. There was a one-story addition to the plant, which was called a basement. This basement had concrete walls and floor and a flat concrete top. The distance from the floor to the top on the inside was ten or twelve feet; the wall on the east side, next to the Mississippi River, was quite broad at the base, but tapered toward the top. In the angle formed by the east wall and the ceiling there were supports called knee braces,

metal beams connected at one end with the steel structure of the wall, about five feet from the top, and extending thence at an acute angle to the ceiling.

On October 16, 1923, appellant was engaged in lowering into the basement, through a hole which had been cut in the top for that purpose, a segment of a circular steel tank. The segment was five feet in diameter and six feet long; its sides were from three-eighths to a half inch thick; it weighed about a thousand pounds; the lower end, which was closed, was convex in form; there were no seams or projections of any kind either on the sides or end. The opening just referred to was near the east wall; it was square, but sufficiently large for the tank to clear its sides by several inches; there was a knee brace about five inches south of its south side. The work of lowering the tank was being done by respondent and two co-employees under the direction of a foreman. The appliance being used for the purpose consisted of an improvised boom and a "chain-block." In order to attach the load to the hoisting apparatus a chain had been wrapped around the tank about one-third of the way from the top and the ends of the chain carried up and hooked on the chain of the "chain-block." To take up "the slack" and make the chain taut wedges of wood, two-by-fours, had been driven in between the chain and the tank. The foregoing gives a general view of the situation.

With respect to the facts just narrated the evidence is without conflict. For the happenings which led up to and occasioned respondent's injuries, we now go to his testimony given while testifying as a witness in his own behalf. While the tank was being let down and when the lower end had reached a point approximately three feet below the opening, it hung on something. Respondent thereupon, in compliance with the orders of the foreman, went below to dislodge it. He found that the descent was being impeded by the lower end of the tank coming in contact with and hanging on the knee brace near the south side of the opening, and that the tank had tipped over from a vertical position. He climbed up on the knee brace and then braced himself against the wall so that he could push the tank clear of the beam with his foot; just as he was prepared to give it a push there was a sudden jerk, and the tank, slipping through the encircling chain, dropped about eighteen inches; it then swung against his body in such a way as to cause a double hernia—"a right and a left inguinal hernia." Just how the tank came against him so as to cause the ruptures cannot be ascertained from the record. The witness "indicated" to the jury, and the reporter was unable, no doubt, to transcribe, or describe, the motions used in indicating. At least he did not do so.

Plaintiff, over the vigorous objections of the defendant, testified with respect to a custom; according to which he claimed that the tank

should have been attached to the lowering apparatus by an appliance different from the one used. As the question of the admissibility of this evidence is the one stressed by appellant as a ground for reversal, we will set out the testimony.

### Direct Examination.

"Q. Do you know at this time, or did you know at that time, what was the usual and customary way of attaching chains onto boilers or sections of boilers or steel or metal objects of this kind? A. I do.

"Q. What is the customary and usual way to attach a chain to a piece of steel?

"Q. Answer the question. A. Answer the question how they are supposed to do that?

"Q. No, the customary and usual way of attaching a chain to a piece of steel? A. The custom is to put screw clamps on these tanks, all four sides, like that (indicating).

"Q. What are screw clamps? A. They are heavy screws tightened up between the surfaces of the tank. It acts like a vise, holding the chain in place. A. It is a clamp in the form of a 'C' or vise. It is a screw knob that clamps tight to the steel.

"Q. Where does it fit? A. On the edge. Here is the tank and fits over like that (indicating), and there is a screw protruding through here (indicating) to hold the tank. This side (indicating) has a vise-like jaw and holds, tightening up the screw holding the chain.

"Q. Were there any screw clamps on this? A. None whatever."

### Cross-Examination.

"Q. How long had you been working for the company prior to this time? A. Close to a year.

"Q. During that time how many times did you take part in lowering things with a block and tackle? A. This was the first experience we had.

"Q. When you undertook to tell your counsel about some custom with reference to tying chains around a tank, you were not talking about any custom at this plant? A. I said they ought to have done that.

"Q. That is your opinion? A. Yes, sir.

"Q. And it is not based upon any experience at this plant, this opinion? A. On beams and one thing and another—stuff like that."

Plaintiff testified that prior to his employment by defendant he was a boiler worker; that his duties as boiler worker were: "high work, iron work, burning, welding and setting up tanks, and so forth." No witness claiming to be qualified to give an opinion testified that the wrapping of the chain around the tank and wedging it

with wooden two-by-four blocks was not a reasonably safe method of attaching the tank to the appliance used for lowering it. No proof whatever of that character was offered on the part of plaintiff.

Defendant's evidence tended to show that there was some jerking caused by the manner in which the chain came through the chain block, but that at no time did the tank slip to any extent through the chain that was wrapped around it, nor did it hang on the knee brace. Defendant's master mechanic, called by plaintiff, testified on cross-examination that the method used, that of winding the chain around the tank and wedging it with two-by-fours was an absolutely safe one; that after the chain had been made tight around the tank it was impossible for it to slip, because the weight operated to make of it a brake; and that he had used that method for twenty years, lowering weights of as much as twenty tons under the same conditions.

The issue as to negligence submitted to the jury was tendered by the petition as follows:

"Plaintiff states that his said injuries were the direct and proximate cause of the defendant's negligence, as follows:

"That while plaintiff was in said basement and assisting in the lowering of said piece of steel, it was the duty of the defendant, through its agents and servants, to exercise ordinary care to provide him with a reasonably safe place to work, and with reasonably safe appliances with which to perform said work; but plaintiff states that defendant and said agents and servants failed to exercise that degree of care, and carelessly and negligently lowered said piece of steel, which was circular in form, with a chain that was not securely attached to said steel and which was dangerous to anyone working in said basement or around said piece of steel, in that the same was likely to slip from its position in said chain or drop suddenly, and by so doing injure a person working thereabout, all of which was known to defendant and its said agents and servants, or by the exercise of ordinary care would have been known."

The answer was a general denial and a plea of contributory negligence.

The mere fact that the tank suddenly dropped down to some extent through the chain which was wrapped around it does not of itself tend to show negligence. Nor does the mere physical situation presented by the method used in attaching the tank to the hoist justify an inference that it was not a reasonably safe method. If there is any evidence in the case tending to establish the negligence pleaded, it is that offered for the purpose of showing that the appliance used in fastening the tank to the pulley chains was not in conformity with common usage. However, such non-conformity, if it existed, is not conclusive evidence of appellant's negligence; it was merely a mat-

ter for the jury to take into consideration in determining that issue. With respect to common usage as a test of due care, Labatt has deduced from the decided cases the following rules, among others:

"It may be laid down as an undisputed proposition that, where the injury complained of was caused by an instrumentality or method which, at the time of the accident, was in its normal condition, evidence going to show that such an instrumentality was or was not commonly used under similar circumstances by persons in the same line of business as the defendant is always competent for the purpose of proving that he was or was not in the exercise of due care in adopting or retaining that instrumentality as a part of his plant.

"The master's negligence is a question for the jury whenever it is warrantable to infer from the evidence that the injury would not have been received if a certain instrumentality or method had been substituted for that actually adopted by the defendant, and that this alternative instrumentality or method was one commonly used by other employers in the same line of business under similar circumstances." [3 Labatt's Mas. & Serv. (3 Ed.) pp. 2528, 2555.] The principles embodied in these rules seem to have recognition in cases decided by both this court and our courts of appeals. [Smith v. Fordyce, 190 Mo. 25, 88 S. W. 679; Jones v. Ry. Co., 178 Mo. 548, 77 S. W. 890; Huhn v. Ry. Co., 92 Mo. 449, 4 S. W. 937; Kane v. The Falk Co., 93 Mo. App. 209; Saller v. Shoe Co., 130 Mo. App. 712, 109 S. W. 794.]

Common usage, within the purview of the rules just referred to, means, when applied specifically, that a particular method or instrumentality is commonly used under the same or similar circumstances by persons in the same line of business. It is not sufficient to show that a given appliance is commonly used by men engaged in the same line of work; it must be so used under similar circumstances. The circumstances need not be precisely similar; "but evidence of usage should be rejected unless there is a fairly close parallelism between the conditions to which the evidence relates, and those which existed at the time and place with which the action is concerned." [Labatt, supra, pp. 2558, 2559, citing: McGar v. National Mills, 22 R. I. 347; Journeaux v. Stafford Co., 122 Mich. 396; Craven v. Mayers, 165 Mass. 271; Johnson v. Coal Co., 28 Utah, 46.]

There was no evidence in the instant case tending to show that men engaged in the same line of work commonly used screw clamps under conditions similar to those attending the operation in which appellant was engaged at the time of respondent's injury. It does not appear from plaintiff's testimony that he knew what appliance was commonly used under such or similar circumstances. On the contrary it is inferable from his testimony as a whole that the only operations in "lowering things" which had come within the range

of his observation involved the lowering of "beams and one thing and another—stuff like that," and that from such observations he had formed the opinion that screw clamps ought to have been used for the purpose of attaching the segment of the tank to the pulley chains. His testimony with respect to the use of screw-clamps was irrelevant and should have been excluded.

As the respondent may be able on another trial to establish the common usage contended for by competent evidence, he will be afforded an opportunity to do so. The judgment of the circuit court is reversed and the cause remanded. All concur.